# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed July 11, 1898.

## WESTERN MARYLAND RAILWAY COMPANY

### VS.

## LAWRENCE FRANK KEHOE, ET AL.

*Bernard Carter, John P. Poe* and *J. Markham Marshall* for plaintiff.

*Skipwith Wilmer* and *D. G. McIntosh* for defendant.

SHARP, J.—

The bill in this case was filed by the Western Maryland Railroad Company against Kehoe and others to obtain an injunction and for other relief.

The bill alleges that Kehoe recovered a judgment against the Railroad Company in the Circuit Court for Baltimore County on September 20, 1895, for $12,000 for damage for loss of a leg. That an appeal was taken and this judgment reversed by the Court of Appeals and a new trial ordered (83 Md. 447). The case was then removed to the Circuit Court for Harford County and a second trial took place in Harford County in November, 1896. This trial resulted in a verdict and judgment for Kehoe for $11,000. An appeal was taken to the Court of Appeals and the judgment was affirmed (86 Md.). The Railroad Company having refused to pay the judgment, suit was entered on the appeal bond. The Railroad Company asks in this case for an injunction to restrain the prosecution of the suit on the appeal bond and to restrain Kehoe and the other defendants from seeking in any way to give effect to the judgment of the Circuit Court for Harford County and to obtain a decree for the payment of all costs and expenses incurred by the Railroad Company in defending the cases in the Circuit Courts for Baltimore County and Harford County and in the Court of Appeals.

The grounds for this application are substantially as follows:

"That there existed, as applicable to the trial in Baltimore County, a secret agreement between Mr. R. Barton, Jr., one of Kehoe's counsel, and Patrick O'Boy, his most important witness, without whose evidence it was impossible for him to recover, to pay O'Boy a compensation for appearing and testifying on behalf of Kehoe; that such compensation was to be contingent upon the recovery of a verdict and judgment, and to be payable only out of the judgment when collected."

"That this agreement, though applicable originally to the trial in Baltimore County, was, after that trial, not only recognized," * * * "but was extended by Mr. Barton with O'Boy as to cover and apply to the trial in Harford County, and that it was in full force at such trial in Harford County when O'Boy was called as a witness for Kehoe, and testified in his favor at that trial upon the vital issues in the case."

"That the existence of the agreement and its applicability to the trial in Harford County, were not disclosed to the Court and jury at that trial by any of the parties to it, but, on the contrary, that O'Boy was produced by Barton, of counsel for Kehoe, in the false and misleading attitude of an absolutely disinterested and impartial witness, and his testimony was submitted to the jury with all the weight which such an apparently disinterested attitude was naturally calculated to give to it."

"That the inequitable tendency of such an agreement was to create in the mind of O'Boy an irreconcilable conflict between his duty to speak the truth, the whole truth and nothing but the truth, no matter how unfavorable to Kehoe it may be, and his interest to color, suppress, pervert or distort the facts for the benefit of Kehoe and his own pecuniary advantage."

From these facts it is argued as a conclusion of law, "That by reason of this tendency, the agreement was contrary to the plainest principles of public policy and palpably illegal, and that accordingly the parties to it cannot be permitted to enforce a verdict and judgment founded upon testimony given under the influence of such an illegal compact."

The existence of an agreement or understanding between O'Boy and Kehoe's counsel is not disputed; its terms only are in controversy. Mr. Barton's account of the way this agreement came to be made is substantially as follows: The accident by which Kehoe lost his leg occurred July 30, 1895. A few days afterwards O'Boy wrote to Kehoe saying he was brakeman on the train which ran over Kehoe and offered to tell him how the accident occurred. This letter was given by Kehoe to Mr. Barton, who had been retained by Kehoe, and who immediately went to see O'Boy. O'Boy then gave Mr. Barton an account of the accident. This was done voluntarily; no promises of any kind were made to O'Boy at this time. The importance of O'Boy's testimony being apparent, Mr. Barton endeavored to keep in touch with him. He told O'Boy

he would be an important witness, and Kehoe might want to produce him at any time. Mr. Barton gave O'Boy his address and asked him to let him know of his movements. O'Boy went to Mr. Barton's office two or three times in the following five or six weeks to tell about his movements. He changed his address once or twice during these six weeks. He had been discharged by the railroad and was seeking employment. Failing to obtain any, he called one day at Mr. Barton's office, about six weeks after the first interview, and told him he could not get work in Baltimore and was going to leave the city, and did not know where he would go. Mr. Barton urged O'Boy to keep writing to him informing him of his address, so that he could be produced at the trial when needed. Then, for the first time, the question of compensation was mentioned. O'Boy then said, in reply to Mr. Barton's request, that this would be a good deal of trouble and he did not think he ought to be asked to do all this for nothing. Mr. Barton at first replied that under no circumstances could Kehoe pay O'Boy anything. Afterwards, on reflecting that O'Boy was a stranger to Kehoe and under no obligation, friendly or otherwise, to take any trouble or incur any expenses on his behalf, Mr. Barton advised with his father, Mr. Randolph Barton, Sr., who said that under the circumstances "any expense he might be put to, or any trouble that he was put to on our account could be properly returned to him." Mr. Barton, Jr., thereupon wrote the letter to O'Boy, dated ———— ————, which made the promises relied on. This letter has been lost. There was no other agreement than that expressed in this letter. O'Boy left the city about this time. He returned shortly before the trial in Baltimore County, but this fact was not known until too late to procure his attendance at the trial.

The terms of the agreement are now in dispute. It is claimed on behalf of the railroad company that, either by the express terms of the letter or by its necessary interpretation, the agreement was to pay O'Boy a sum in proportion to the value of his testimony, and that the payment was conditional on Kehoe obtaining a judgment, and that the sum to be paid was payable out of the sum recovered, and not otherwise.

It is claimed by Kehoe that the agreement was to pay O'Boy reasonable compensation for his services in keeping Kehoe, or his counsel, informed of his whereabouts, so that his testimony could be procured when needed, and for any loss of time involved in giving his testimony, and for expenses incurred in this connection.

It is not contended by the railroad company, nor does the evidence warrant even the suspicion of the fact, that Kehoe's counsel endeavored to induce O'Boy to tell anything but the truth, or that they made any suggestions to him, or endeavored in any way to influence him, as to what his testimony should be. The complainant claims, not; that the agreement was that O'Boy should give false evidence, but that it had a tendency to induce him to do so on account of his alleged interest in the result of the trial. It is not alleged in the bill, though this was urged in the argument, that O'Boy did in fact commit perjury.

A very careful consideration of the evidence leads me to the conclusion that the agreement was that claimed by Kehoe. Mr. Barton's evidence is positive. He says (Test., pp. 4-31), that after he had advised with his father, he wrote the letter of ———— ————, in which he said, substantially, that he had, since O'Boy's departure, considered the question, and that it was a perfectly reasonable thing, if O'Boy would write Kehoe's counsel and let them know where he was and come on when he was wanted, that Kehoe should reimburse him for his time and expenses. I see no reason to doubt, in the slightest degree, the statement made by Mr. Barton. His statements are entitled to weight, not only because of his reputation as a member of the Bar, but because he has invited a full investigation, and has made a very frank and full disclosure of all facts known to him and all the correspondence between him and O'Boy. It would require evidence of much more convincing character than any produced in this case to impeach his credibility in the slightest degree.

There is no evidence leading to the conclusion that the sum to be paid O'Boy was to be in proportion to the value of his services. In fact, the evidence is the other way. In his letter of March 21, 1896, called the "penitential letter," O'Boy says nothing about

any compensation, although he is about to leave the city, knows the motion for a new trial has been overruled, and has, therefore, reason to think the case settled, and that Kehoe will soon receive the amount of the verdict. In his letter of March 23, 1896, advising against a compromise, he says nothing about compensation. In his letter of April 25, 1896, he refers distinctly to the claim made by the Railroad Company that he was to get $500 out of the sum recovered and disclaims any such right. He never demanded anything of Kehoe, though he had reason several times to suppose the case concluded.

O'Boy did not appear to attach much value to his claim against Kehoe.

He sold the letters containing the only evidence he possessed of the agreement for a trifling sum and after the case was finally decided by the Court of Appeals and Kehoe, as O'Boy had every reason to suppose, was entitled to the immediate payment of $11,000, made over to the Railroad Company his supposed claim against Kehoe. The verdicts, in both cases, being so large and the importance of his testimony being conceded, it is not likely he would do this had he believed that Kehoe was under any obligation to pay a sum proportioned to the value of his services.

Nor does the evidence sustain the contention that the payment was contingent. The expressions in the letters which passed between Mr. Barton and O'Boy, relied on to support this contention, are entirely consistent with the theory that payment of the sum recovered was but a convenient way of making payment. These expressions do not show that the agreement was that the payment was contingent or that Kehoe was not to be liable in any event. At the trial in Harford County, O'Boy was paid his railroad fare and lunch for two days. He made no claim to any more. His expenses for the third day were paid by the railroad company.

In view of the grave charges made, it was due to the parties to investigate the facts very carefully and to express the conclusion arrived at, though the character of the agreement was, in my judgment, immaterial. Had the agreement been as alleged by the complainant, the relief asked for must still have been denied.

The existence of the agreement was known to the railroad company as early as April 13, 1896. On that day, Loy, an employee of the company, wrote to Mr. Hildebrandt, the train manager, that he had seen O'Boy, who had told him he knew something which "would knock the Kehoe side of the case crazy," and showed him two letters from Mr. Barton, the purport of which, as Loy remembered them, he communicated to Hildebrandt. This lead to investigation. Detectives were employed and the letters of February 3, 1896, and March 23, 1896, purchased. These letters distinctly refer to the agreement. With knowledge of the agreement in its possession and of O'Boy's relation to Kehoe, the railroad company proceeded to trial in Harford County. O'Boy was called as a witness for Kehoe, and was exhaustively cross-examined. He was afterwards called for the railroad company, yet no effort was made to prove the fact of the agreement. This was done intentionally.

"There are no maxims of the law more firmly established or of more value in the administration of justice than the two which are designed to prevent repeated litigation between the same parties in regard to the same subjects of controversy, namely, *interest rci publicae ut sit finis litium* and *nemo debet bis vexari pro una et eadam causa.*"

"If the Court has been mistaken in the law, there is a remedy by writ of error. If the jury has been mistaken in the facts, the remedy is by motion for new trial. If there has been evidence discovered since the trial, a motion for a new trial will give appropriate relief. But all these are parts of the same proceedings; relief is given in the same suit and the party is not vexed by another suit for the same matter."

U. S. vs. Throckmorton, 98 U. S. 65.

All matters in issue in a case are conclusively settled by the judgment. The estoppel of a judgment extends not only to matters which were, but to matters which might have been, but were not presented. State vs. Brown, 66 Md. 203.

The competency and credibility of witnesses and the effect of their testimony is in issue in every case. (Herman on Estoppel, 456 S. 394 n. 1). It is conceded by the complainant, and in

fact much emphasis was put on this point, that without O'Boy's evidence Kehoe could not have obtained a judgment. It is therefore evident that his credibility and the effect of his testimony were in issue in the case in Harford County. The judgment in that case is consequently conclusive.

It is contended for the complainant that an agreement to pay a witness in proportion to the value of his testimony, payment to be made out of the sum recovered and conditional on recovery, is "contrary to the plainest principles of public policy and palpably illegal." This is undoubtedly true, but a stronger case than this is presented when the case is shown clearly to be false. There is no offense more abhorent to Courts in the administration of justice than perjury, yet it has been held in numerous cases that equity will not avoid a judgment which has been obtained by false testimony. The reason for this is that the peace of society requires that there shall be an end to controversies. In almost every case of importance there is conflicting testimony. Witnesses look at transactions differently; their statements are consciously or unconsciously affected by their hopes, wishes and prejudices; some have more tenacious and accurate memories than others, and in many cases it would be impossible to distinguish between deliberate perjury and defective memory or powers of observation. There are many imperfections in human testimony, and if a controversy could be a second time examined and the judgment vacated on the claim of false evidence, the judgment in the second case might in turn be vacated for the same reasons and there would never be an end to controversies. Cross-examination, counter testimony and prosecutions for perjury are the safeguards surrounding litigants against false testimony.

Gott vs. Carr, 6 G. & J. 208-309.
U. S. vs. Throckmorton, 98 U. S. 66.
Vance vs. Burbank, 101 U. S. 514.
Riddle vs. Baker, 13 Cal. 295.
Amador vs. Mitchell, 59 Cal. 168.
Rice vs. Cohn, 91 Cal. 129.
Smith vs. Lowrie, 1 Johns. Ch. 320.
Ross vs. Wood, 70 N. Y. 9.
Hillsborough vs. Nichols, 46 N. H. 379.
Folsom vs. Folsom, 55 N. H. 79.
Lyford vs. Demmert, 32 N. H. 234.
Grat vs. Boston, 62 Mich. 186.

Dixon vs. Graham, 16 Iowa 310.
Cuttle vs. Cole, 20 Iowa 484.
Green vs. Green, 2 Gray 361.
Dulap vs. Glidden, 31 Me. 435.
Colzhausen vs. Kerting, 29 Fed. Rep. 825.
The Acorn, 2 Abbott U. S. 435.
2 Story Equity Jur., S. 1575.
1 Herman on Estoppel 456, n. 1.

In some of the cases cited, the perjury was not discovered until after the trial; in others, the witness was convicted of perjury; in some, the facts sowed a conspiracy between the witness and one of the parties, so that this question has been considered from a good many points of view.

There are many other illustrations of the same rule, such as forged documents, collusion between attorneys, concealed interests of parties, etc., which will be found in the following:

Throckmorton's case, 98 U. S.
Smith vs. Miller, 42 ——, 182.
Tovey vs. Young, 1 Pres. in Ch. 193.
Dingel vs. Jewett, 42 N. J. 573.

1 Herman on Estoppel, S. 395, p. 457, S. 391.

But I have selected the case of perjury as the strongest possible case. If a Court of Equity will not avoid a judgment obtained by perjury, much less will it because of an agreement between one of the parties and a witness to commit perjury, or as is alleged by the complainant in this case, an agreement, the tendency of which is to encourage perjury. That such an agreement is void and unenforceable and entirely reprehensible is quite true, yet it is apparent that no relief can be granted in equity under the circumstances of this case. It is contended that such an agreement is a fraud not only on the injured party, but on the Court, and that fraud vitiates all things, including judgments.

The frauds for which equity will avoid a judgment are not frauds which were in issue in the former case, but frauds which prevented the injured party from properly presenting his case, so that there was in fact no trial, as when one party deceived his opponent about the time of the trial or bribed a witness not to attend or induced him by a false promise of a compromise to stay away from Court or was kept in ignorance of the suit by the act of his adversary. These and other cases are mentioned in Throck-

morton's case. See also Herman on Estoppel, etc. Kent vs. Richards, 3 M. C. D. 393. This exception to the rule of *res judicata* has no application to this case. It does not appear that Kehoe or his counsel actively interfered to prevent the complainant from proving O'Boy's supposed interest, or that they in any way induced O'Boy to conceal the fact from the complainant. On the contrary, they told O'Boy to tell the Railroad Company all he knew.

It is contended for the complainant that it was the duty of Kehoe's counsel to tell the Court and jury about O'Boy's relations to Kehoe, and that he ought not to have been put on the stand in the attitude of a disinterested witness.

There was no such duty to the complainant. The parties were antagonists, and there were no such relations of trust or confidence between them as required either to disclose his case to the other. Moreover, it is a rule that to avoid a contract or other obligation for deceit or concealment, it must appear that the complainant was in fact deceived and injured. If he knows the truth, there is no fraud. The existence of the agreement with O'Boy was known months before the trial. Due diligence required the complainant to ascertain its terms. There was ample opportunity to do this and it was not done.

But it is contended that the concealment of the facts of O'Boy's interest was a fraud on the Court and the administration of justice, which will lead the Court out of consideration of public policy, without regard to the conduct of the complainant or the effect of its decree on the parties, to forbid the enforcement of a judgment obtained by such means.

The cases in which equity has been asked to set aside judgments on the ground that documents were forged or testimony false were cases calling more strongly for the application of this doctrine than the present case, yet equity refused to interfere.

In a case similar in many respects to the one at bar the Supreme Court of the United States declared this not sufficient ground to avoid a judgment.

U. R. R. Co. vs. Dull, 124 U. S. 174.

The following are also in point;
Tovey vs. Young, 1 Pre. in Ch. 193.
Patch vs. Ward, 3 L. R. Ch. Ap. 203.
Ward vs. Southfield, 102 N. Y. 295.

There was ample opportunity in the trial at Harford County to prove the existence of the agreement with O'Boy and thus impeach his testimony. The Railroad Company had the two letters, and both O'Boy and Mr. Barton were in Court. This was not done. This was not for want of diligence, but for reasons of policy. The matter was discussed and it was decided to be for the best interests of the Railroad Company not to attempt to prove this fact. A party cannot stand by with proof of the fraudulent character of his opponent's claim in his possession, and afterwards, when the case has gone against him, ask a Court of Equity to avoid the judgment.

Gott vs. Carr, 6 G. & S. 308, 309.
Twigs vs. Hopkins, 85 Md. 301.
Kearney vs. Lascer, 37 Md. 264.
Kirby vs. Pascault, 53 Md. 532.
Gorsuch vs. Thomas, 57 Md. 339.

"Cancelling an executed contract" (and the same may be said with greater force of a judgment) "is an exertion of the most extraordinary powers of a Court of Equity. The power ought not to be exercised except in a clear case and never for alleged fraud unless the fraud be made to appear; never for alleged false representations unless the complainant has been deceived and injured by them."

Atlantic D. Co. vs. James, 94 U. S. 207.

It follows from what has been said that the bill must be dismissed.