## EASTERN DISTRICT,

## 1857.

———o———

## COUNTY OF PENOBSCOT.

———o———

### EBENEZER WHEELDEN *versus* JOHN H. WILSON.

Parties being witnesses, must testify, subject to the same rules as other witnesses, unless restricted by the law which permits them to testify.

A witness who is also a party to the suit, may testify as to his motive in reference to facts which are within his personal knowledge, competent to be proved and pertinent to the issue.

A stock of goods mortgaged, " in store No. 2, Glidden Block," were subsequently moved to another store. It was held that all the goods in store No. 2 at the time of the mortgage, were covered by it. That moving them from one store to another would not destroy the mortgagee's right to them, though it might render it more difficult to identify them.

Facts and circumstances clearly indicating an intention on the part of both mortgager and mortgagee to place the mortgaged property beyond the reach of legal process, and thereby to delay, if not to defeat creditors, constitute a legal fraud, which may overcome the denial of the mortgagee of a fraudulent motive on his part.

This is an action of TRESPASS, brought against the defendant, who was sheriff, for the act of one Bicknell, alleged to be his deputy, in taking and carrying away the goods of the plaintiff, and comes before the full court on EXCEPTIONS to the

rulings of APPLETON, J., and on MOTION to set aside the verdict, which was for the plaintiff.

The defence was the general issue and a brief statement, that the goods were attached and taken on a process duly issued out of, and now pending in the court.

The plaintiff introduced a mortgage from George R. Wheelden to himself, of all said Wheelden's stock of goods in store No. 2, Glidden's Block, on Exchange street, Bangor, opposite the Veazie Bank, consisting of ready-made clothing, cloths, and furnishing goods, dated March 8, 1856, recorded March 8, 1856, 3 o'clock, 15 min., P. M. Also a mortgage from George R. Wheelden to Charles H. Jones, of all the goods, wares and merchandise in the store, at the date thereof, occupied by said Wheelden, on the corner of Exchange and Washington streets, in said Bangor. Mortgage dated December 23, 1854, recorded December 29, 1854. Also an assignment of said mortgage, from said Jones to the plaintiff, dated May 5, 1856.

Plaintiff called George R. Wheelden, who testified that his store was No. 2, Glidden's Block, on Exchange street, opposite the Veazie Bank. He presented a list of articles in the store at the date of the second mortgage, and their value as he estimated them. That a part of those goods were in the store at the date of the *first* mortgage, enough to pay what is now due on that mortgage. This stock was replenished from time to time by the proceeds of goods sold. The goods were taken and sold by the officer, Bicknell.

I was fearful that somebody might strike. I put them so that I might keep my stock, so that no one could jump upon me. I made the mortgage so that one should not get the whole, and the rest get nothing. I told father when I had his name, that if I saw any chance for trouble, I would so secure him that he would lose nothing by being security for me. I did not know but some one might strike; I did not know who. I was afraid some might attach, so I put it in shape, so that I could make an equal division. This is the conversation had with father. I told him creditors might

Wheelden *v.* Wilson.

trouble me.   I wanted to secure him, and do business in his name, till I could settle my old matters up.   Told him how much I owed White, and how much Sabine and other creditors; that the demands were over due, and that I was apprehensive they might strike upon me.   He came up to have the mortgage made out; I thought I had better give a mortgage to secure him and me.

*Ebenezer Wheelden,* the plaintiff, testified: My son has told the truth as to the transaction, and I cannot state it any differently from what he has.

*Question* by plaintiff's counsel—"What was your motive in taking the mortgage?"   *Objected* to by the defendant and *admitted* by the court.

My motive was to secure what I had let him have, and what I had signed for him; I had no other motive.   He always said he would secure me.   His story is true; I do not know as it is of any use for me to tell it again.   He said when he came down that morning, that he was owing a number round about, and he did not know but what some of them might make trouble or costs.   He told me how it was. He thought it best to come up and have a mortgage made. Don't know whether he or I got the mortgage made; cannot say who paid for the mortgage, whether he or I did; cannot say who paid for recording; think he did.   I went to the clerk's office with him.

*Blake* and *Garnsey,* counsel for the defendant.   Each submitted able arguments in writing.   Mr. Garnsey upon the exceptions, and Mr. Blake upon the motion, as follows:

1. The verdict is against evidence.   The testimony of the father and son both indicate fraud.

Some of the *indicia* of fraud are:

1. The *hurried* manner in which the mortgage was made.

2. That when the $500 note was given by the son to his father, there was no *receipt* taken; that it was in full, or to go in payment of old notes or of liability as endorser, but the father *retained* the old notes, and could *after,* as well as

*before,* have sued in case of his taking up any paper where he had endorsed or guaranteed.

3. The note was *written* on the same sheet with the mortgage, and both delivered back to the son, for he takes them and carries them to the city clerk's office, and pays for the recording.

4. And the son could have taken them from the clerk's office, if so disposed.

5. The plaintiff produces a $250 note, dated April 1, 1851, and says, "I let him have the money at that date. The date of the note shows when it was made." Yet he admits it was made "within three minutes," that is, fixed up preparatory to this trial.

6. This $500 note and mortgage was given when the son did not *suppose* he owed his father anything, and he thought the unsettled account with E. and L. Wheelden was about square. Is not his *intent* thus apparent?

The son said to White, "I thought I did not owe him anything; that was the day of the date of the writ."

White says, "he told me he did not owe his father;" that he "was not in debt beyond what he recently become liable for."

7. The $500 note was given on a year, and the mortgage provides that the son shall retain possession for the year. Is not this conclusive evidence that *bona fide* security was not contemplated by the *father* any more than by the *son*. *Brinley* v. *Spring,* 7 Maine R., 252.

8. The son says, "he advanced me $250, in 1851; can't tell the date; it was in the fall; gave my note for that." Literally true it may be, but just as much a *falsehood* as his father's statement, for it left on the mind of the jury the impression it was given in 1851, as his father first swore, but it was in fact given a few days before the trial, and *antedated.* The *son,* like his *father,* intended to deceive.

9. The father was to run the store, the son swears, and yet he had the right to buy in his father's name, and appropriate money received on such debts as he pleased, "to pay

Wheelden *v.* Wilson.

up demands," &c., and "part where I was holden." This is a *secret trust.*

These are some of the *indicia* of fraud enshrouding the whole case—the footprints that point all one way, and by following their direction a little way, we come to the direct admission by the son, that the mortgage was made to delay creditors, and that his father was told by him why and wherefore it was so made, and his father admits all the son's statements to be true.

Now there is no doubt but the jury would have found the mortgage fraudulent, but for the answer of the plaintiff, that "my motive was to secure what I had let him have, and where I had signed for him; I had no other motive."

But he takes the mortgage with the knowledge communicated by the son. The son's object, viewed most favorably, was to secure a *bona fide* debt, and at the same time to deter his creditors from attaching. And this the father knew, so he knowingly aided his son to commit a fraud, though his principal purpose may have been to secure his debt. But the *end* will not justify the *means.* He was "*particeps criminis,*" and as the court well say, in 16 Mass. R., 324, " in the case of a fraudulent assignment there can be no lien in favor of the assignee." " The man who fraudulently receives the property of another, to prevent its being attached, ought not to have the right, against the will of the creditors, whom it is attempted to defraud," " to secure his own debt, and aid his friend to lock up his property from attachment."

It is well said, too, by this court, in 4 Maine R., 207, that " if a conveyance is made by a man who is insolvent, upon a good and sufficient consideration advanced to him, but not *bona fide*, and the purchaser is connusant and assenting to the fraudulent intent, it is void against creditors."

And it does not relieve this case that the mortgager intended no fraud to his creditors, as a body, and in the end designed it, if he did, for their eventual good. *Kimball* v. *Thompson,* 4 Cush. R., 446.

Though I think the real object was not to secure the father, but that a *debt to the father* was used as a *cover*, to conceal the real object, viz: to delay creditors.

He mortgaged his whole stock, without an account being taken, without marking them anew, and being all the property he had, being seven to eight hundred dollars, and at a low estimate, as he swears, to secure five hundred dollars.

This case is very similar, in point of fact, with *Crowningshield* v. *Kittridge*, 7 Met. R., 522. And it settles this case.

" The mortgage was enough to pay all my debts, leaving no surplus," he says, and yet all is pledged to father, with design to delay *other* creditors, and father co-operates in the same design, to aid his son.

Is not this fraud? Son gave mortgage, he says, in another place, " to secure *him* and *me*." Is there not a secret trust here ?

*A. H. Briggs*, counsel for the plaintiff.

The only question raised by these exceptions, worth discussing, is, whether the mortgage describing certain goods, while in one store, still covered them when removed to another.

There seems to be no reason' why the plaintiff should not be entitled to hold the property mortgaged to him, let the mortgagee or himself carry them whither they will.

The plaintiff had a mortgage executed prior to the defendant's attachment.

That mortgage contained a full and sufficient description of the property—" being the stock in trade at that time in a certain store on a certain street in Bangor. *Wolfe* v. *Dorr*, 24 Maine R., 104; *Burdett* v. *Hunt*, 25 Maine R., 419; *Smith* v. *Smith*, 24 Maine R., 555.

That mortgage was recorded before defendant's attachment, and legally recorded. The time of being recorded was noted on the mortgage. R. S., ch. 125, ss. 32 and 33. *Handley* v. *Howe*, 22 Maine R., 176.

The recording of that mortgage was equivalent to a delivery of the goods. *Goodenow* v. *Dunn*, 21 Maine R., 86.

Wheelden *v.* Wilson.

Thus fortified in title, and there being no fraud, as the jury have found, had not the plaintiff a right to take the possession of these goods, convey them whither he would, put them in what store he pleased, and reclaim them anywhere anybody might carry them, either with or without his approval?

Thus fortified, the plaintiff commenced his action against the sheriff—brought trespass, which is the proper remedy, *Grennell* v. *Philips,* 1 Mass. R., 530, and the jury gave in damages the value of the goods when taken, *Smith* v. *Putney,* 18 Maine R., 87, being governed, as it seems, by the appraisers' valuation.

But the judge instructed the jury that the mortgage covered whatever goods were taken by the defendant from the second store which were in the first. The finding of the jury under this instruction leaves no ground for a question of the kind raised, and this ends the talk about the exceptions.

There is another question raised about the admission of Wheelden, senior, to state what his real intentions were, in taking the mortgage. I do not care to discuss whether a party witness, if permitted by law to testify at all, shall or shall not be permitted to testify directly as to his intentions about which he is supposed to know—when his intentions are all that is necessary to be known, and to find out which, all testimony is directed in such a suit, because if the mortgagee did not take the mortgage with the intention in whole or in part, to defraud creditors, then no matter who else had that intention, or what other element enters into the case.

The question raised by the motion and report pertains wholly to the matter of fraud, as that was the defence relied on by the defendant.

On this point the testimony of both the Messrs. Wheelden, and especially the Wheelden senior, was so fair, clear and distinct, and truthful, as to the father being a *bona fide* creditor of the son—as to the son's intention to secure his father,

to go along and close up his affairs, and pay all his debts, and as to the father's intention and honest purpose only to secure himself, and not to assist his son to delay creditors, only so far as it must be incidental to his securing himself, was perfectly satisfactory to the jury, and will be so to this court.

RICE, J.   The plaintiff presented himself as a witness upon the stand in his own behalf, and was permitted by the court, against the objection of the defendant, to answer the following interrogatory, proposed by his counsel: "What was your motive in taking the mortgage?"   The validity of the mortgage, with reference to which this inquiry was made, was a material fact in issue between the parties.   It was assailed by the defendant on the ground of fraud.   Whether it was fraudulent, so far as the plaintiff was concerned, depended entirely upon the intent or motive with which he received it.   If it were received for the honest purpose of securing a debt due from the mortgager, or to protect himself from liabilities which he had assumed for the mortgager, and for no other purpose, the law will uphold it.   But if taken by the plaintiff for the purpose of aiding or assisting the mortgager to defraud or delay his creditors, or if such purpose constituted any part of the motive which induced him to take the mortgage, then it was fraudulent and void as to creditors.   The question of motive or intention was a question of fact, to be determined by the jury.   Ordinarily such facts can only be proved by circumstantial evidence, for the obvious reason that no living witness can absolutely *know* the motives which influence or govern the conduct of others.   The secret thoughts and intentions of men are *known* only to themselves and to God.   Hence the necessity of inferring from surrounding circumstances the motives which govern human conduct, and give character to the acts of man.

In all cases it is desirable to have direct and positive testimony, where it can be obtained.   The law requires parties to produce the best evidence which the nature of the

case will admit, and witnesses are required to state all facts within their knowledge which are pertinent to the issue to be determined.

Was the fact to which the interrogatory referred competent to be proved and pertinent to the issue then before the jury? And if so, was it within the personal knowledge of the plaintiff? Most clearly so. It was the material fact in the case, and this witness alone had positive personal knowledge upon that point.

The objection that to admit the testimony would hold out strong inducements to parties to commit perjury, addresses itself to the legislature rather than to the court. Parties being witnesses must testify subject to the same general rules as other witnesses, unless restricted by the power by which they have been permitted to testify.

No error is perceived in the ruling of the judge as to the description of the goods in the mortgage. Moving them from one store to another could not destroy the mortgagee's right to them, though it might render it more difficult for him to identify them as the goods covered by his mortgage. The burden of proving the identity was upon him; if he failed, the defendant could not be injured thereby.

The motion presents more serious difficulties. The mortgager, called by the plaintiff, testified, among other things, as follows: "I was fearful somebody might strike. I put them (the goods) so that I might keep my stock, so that no one could jump upon me. I made the mortgage so that one should not get the whole, and the rest get nothing. I told father when I had his name that if I saw any chance for trouble I would so secure him that he would lose nothing by being security for me. I did not know but some one might strike. I was afraid some one might attach, so I put it in a shape so that I could make an equal distribution."

This testimony, and there is much more of similar import, proves the transaction fraudulent on the part of the mortgager, past all doubt. Did the mortgagee have knowledge of and participate in, or assent to the fraud. He testifies that

in his participation in the transaction he had no fraudulent intention. The mortgager, referring to the testimony above recited, says, " this is the conversation had with father," and again, this witness, in speaking of the plaintiff, says, " he thought a year would be sufficient in which to fix up my matters."

The plaintiff also testified, " My son has told the truth as to the transaction, and I could not state it any differently from what he has." " He said, when he came down that morning, that he was owing a number round about, and he did not know but what some of them might make trouble or costs ; he told me how it was ; he thought it was best to come up and have a mortgage made. Don't know whether he or I got the mortgage made ; can't say who paid for the mortgage ; can't say who paid for recording ; think he did."

The transaction was surrounded with many circumstances, not conclusively proving fraud, it is true, but which have ever been looked upon with suspicion, as indicating a fraudulent intent.

Thus the transaction was between near relatives—father and son ; the transfer was in gross, and of all the visible property of the mortgager ; no account of stock was taken ; no change was made in the actual possession of the property mortgaged ; the business was carried on in the same manner after as before the mortgage ; no settlement was made by which the respective rights of the parties were determined ; the mortgager was deeply embarrassed and in constant apprehension that his creditors would attach his goods, which fact the plaintiff well knew, as he did the motive which induced the mortgager to act.

These facts and circumstances, in our judgment, overcome the denial of the plaintiff of a fraudulent intent on his part.

It may not have been the intention of either the mortgagee or the mortgager to perpetrate a moral fraud ; they may have intended to act for the benefit of all the creditors of the mortgager ; but that they both intended to place the property mortgaged beyond the reach of legal process, and

thereby to delay, if not to defeat, creditors, we think the case clearly shows. This constitutes a legal fraud.

The exceptions are overruled, but the motion is sustained, and a new trial granted.