# UNION RAILROAD COMPANY *v.* DULL.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF MARYLAND.

Argued November 15, 16, 1887. — Decided January 16, 1888.

In a suit in equity the court, in determining the facts from the pleadings and proofs, the answer being under oath, applies the rule stated in *Vigel* v. *Hopp*, 104 U. S. 441.

The fact alone that after a contract was entered into by a railroad company for the construction of a tunnel, one of its employés who neither rep-

resented it in making the contract, nor had supervision and control of the work done under it, or in the ascertainment of the amount due the contractors, was, without the knowledge of the company, admitted by the contractors to a share in the profits, affords no ground in equity for setting aside an award between the contractors and the company settling the sum due from the company under the contract after its complete execution, and the judgment upon the award.; nor does the fact that the employé was a material witness before the arbitrators in determining the sum awarded furnish such ground, when there is nothing in the case to show that he stated what he did not believe to be true, and when the weight of the evidence shows that what he said was true.

Under the circumstances of this case the court applies the rule stated in *Atlantic Delaine Co.* v. *James*, 94 U. S. 207, that the power to cancel an executed contract " ought not to be exercised except in a clear case, and never for an alleged fraud unless the fraud be made clearly to appear; never for alleged false representations. unless their falsity is certainly proved, and unless the complainant has been deceived and injured by them."

BILL IN EQUITY.   Decree dismissing the bill.   The complainant appealed.   The case is stated in the opinion of the court.

*Mr. William A. Fisher* and *Mr. Charles Marshall* for appellant.   *Mr. Thomas W. Hall* and *Mr. Bernard Carter* were with them on the brief.

*Mr. I. Nevett Steele* and *Mr. Arthur W. Machen*, for appellees.

MR. JUSTICE HARLAN delivered the opinion of the court.

This suit was brought by the appellant in the Circuit Court of Baltimore City, and was subsequently removed into the Circuit Court of the United States for the District of Maryland.   Its principal object was to obtain a decree setting aside, as void against the appellant, certain construction contracts between the Union Railroad Company of Baltimore, James J. Dull, William M. Wiley, and R. Snowden Andrews; a contract of arbitration between that company and James J. Dull, surviving partner of William M. Wiley, together with the award of the arbitrators, and the judgment entered pursuant thereto; and, also, a written agreement between the

Canton Company of Baltimore and James J. Dull, surviving partner of William M. Wiley, together with certain promissory notes given in execution of the last named agreement. A part of the relief asked was a decree compelling James J. Dull, as surviving partner, Samuel M. Shoemaker, (now deceased, and whose administrators with the will annexed are before the court,) and John Ellicott, to refund certain sums which they had received on account of the judgment based upon said award, and on said promissory notes.

The defendants, Dull, Shoemaker, and Ellicott, were required to answer, and did answer, under oath, not only the material allegations of the bill, but various special interrogatories propounded to them. Upon final hearing, the injunction granted at the commencement of the suit was dissolved, and the bill dismissed. Of that decree the appellant complains.

Stating only such facts as are clearly established by the answers made under oath, *Vigel* v. *Hopp*, 104 U. S. 441, 2 Story Eq. §.1528, by the exhibits, and by the depositions, the case before us is, in substance, as follows :

On the first day of May, 1871, the railroad company made a written agreement with Dull, Wiley, and Andrews, for the construction by those parties, for the prices and upon the terms therein stated, and to the satisfaction and acceptance of its chief engineer, of the graduation and masonry of section 1 of said railroad, including a tunnel under the bed of Hoffman Street, in the city of Baltimore, and such other work as might be necessary to finish that section in accordance with the specifications and agreeably to such directions as might be given by the company's chief engineer, or by his assistant in charge of the work for the time being. The contractors agreed to complete the work on or before January, 1873, the parties expressly stipulating that the time so named should be of the essence of the contract.

On the 1st of May, 1871, the parties entered into a supplementary agreement, providing for the indemnification of the company against all claims or damages arising from the tunnel or excavation work under the bed of Hoffman Street.

Shortly thereafter, Andrews, with the consent of the company, assigned and released to Dull and Wiley all his interest in the original and supplemental agreements.

On the 20th of December 1875, Wiley having died, and Dull, as surviving partner, having instituted suit against the railroad company in the Baltimore City Court, a written agreement was entered into between the company and Dull, as such surviving partner, which is at the foundation of the present litigation.   That agreement recites the completion of the work covered by the original and supplemental agreements of May and July, 1871; the claim by Dull of a large balance due him as surviving partner; a dispute between the parties as to what was due from the railroad company under said contracts of construction, as well as for work done and materials furnished by the contractors; the claim of Dull, as surviving partner, to be paid for certain stone used by the contractors, in addition to what was required by said agreements; the claim of the company that the contractors had not finished the work within the time stipulated, and in a substantial manner, to the satisfaction and acceptance of the chief engineer or his assistant in charge of the work for the time being; its claim that it had been compelled to pay damages against which the contractors could, with due care, have guarded them; and the claim of the company, that, after deducting its said demands, it was entitled to recover a balance.   By this agreement, all matters of difference between the parties, and their respective claims against each other, were referred to the arbitration of indifferent persons to be chosen as follows: one by each party, the two thus chosen to select a third arbitrator, and no one of the arbitrators to be a lawyer.   The arbitrators were authorized to determine such matters of difference, and award what sum should be paid by the railroad company to Dull, or by the latter to the former, and the award to be " final and conclusive in the premises."

The agreement further provided that the action of Dull, then docketed in the Baltimore City Court, should, by rule of court, " be submitted and referred to the award and arbitra-

ment of the said three arbitrators, whose award, or the award of a majority of them in the premises, shall be returned to said court, to the end that judgment may be given therein in accordance with the provisions of Article VII. of the Maryland Code of Public General Laws;" further, that the true construction, meaning, and extent of certain covenants in the supplemental agreement should be finally and conclusively determined by Alexander Sterling, jr., esquire.

Pursuant to this agreement, Henry Tyson and Robert K. Martin were selected by the parties, respectively, as arbitrators. They concurred in selecting H. D. Whitcomb as the third arbitrator. By consent an order was passed in the Baltimore City Court, referring the case pending there to said arbitrators. Upon full examination of all matters and claims in dispute, they unanimously awarded $54,159.50 to be paid by the company to Dull, and judgment for that amount was, accordingly, entered, in the Baltimore City Court, on the 11th of January, 1877, in favor of Dull, surviving partner of Wiley.

On the 25th of February, 1877, a written agreement was entered into between Dull and the Canton Company of Baltimore, whereby the former agreed, among other things, to delay action upon his judgment, and to accept payment of the balance then due upon it — $47,562.15 — as follows: $5000, July 2, 1877; $10,000, February 7, 1878; $14,000, February 7, 1879; $18,562.15, February 7, 1880; for which amounts the Union Railroad Company executed to Dull its promissory notes, as well as interest notes for $1276.86, $1298.14, $976.86, $993.14, $556.86, and $556.14. These notes, principal and interest, were guaranteed by the Canton Company. The latter agreed that it would pay each note within one week after default by the railroad company. Dull reserved the right, in addition to his recourse on the Canton Company, to sue out execution on his judgment against the railroad company for any balance due thereon at the time of default in paying any of said notes at maturity.

The present suit was brought on the 10th of February, 1879, at which time all of said notes, principal and interest, had been paid except those due the 10th of February, 1879,

and after that date. We have already indicated what the general object of the suit is, and the extent to which the appellant asks relief. The principal grounds upon which it proceeds are, that at the time the construction contracts and the specifications and other papers connected therewith were prepared for biddings, and at the time of the execution of those contracts, Charles P. Manning was the chief engineer and John Ellicott the assistant engineer of the railroad company; that, by reason of Manning's absence during long periods in Ohio, the preliminary arrangements for the biddings, the interviews with the parties proposing to bid, the construction contracts, and the general superintendence of the work, for some months after its commencement, was left almost entirely to Ellicott, in whom the appellant and Manning had the fullest confidence; that Ellicott remained in that position for about a year, when he left appellant's service because of differences between him and Manning, who had then returned to Baltimore; that there was no just foundation for any of the claims of Dull allowed by the arbitrators; that Ellicott "was presented and sworn by the arbitrators as a disinterested witness on behalf of the said Dull, and upon his testimony, mainly, if not entirely, the said arbitrators allowed the pretended claim of the said Dull, based upon an allegation of the change of the model for the construction of the said tunnel and also other claims made by the said Dull, to which change said Ellicott testified, although in fact no change was made of the execution of said contract;" that Dull himself was sworn and examined before the arbitrators, and testified, among other things, that he was the sole surviving contractor, and that the only contractors had been said Andrews, Wiley, and himself; that it had learned only recently before the bringing of this suit that, in an action in the Circuit Court of the United States for the Eastern District of Pennsylvania, Dull admitted, under oath, that he and Wiley had two secret partners in the construction contracts, "who retained their interests until the completion of the work and during said controversy, one of them being Samuel M. Shoemaker, and the other being the said John Ellicott;" that Dull, on the same occasion, admitted

that " he had paid large sums to the said Ellicott on account of his interest in the contract, but had not yet fully paid him;" that Ellicott received from Dull and Wiley on that account at least $18,000.

The bill charges that the amount awarded to Dull was "so awarded by virtue of the said contracts, and by means of the covinous and fraudulent conduct of the said Dull and the said Ellicott;" that the said construction contracts and the said arbitration contract were obtained from the company " by the fraud, covin, and deceit of the said Dull and Ellicott, with the knowledge of the said Samuel M. Shoemaker;" and that the said contracts, and said award and judgment, are in equity void as to the company.

The precise relations which Ellicott held to the railroad company and to the work done by the contractors, and which existed between the contractors, Ellicott and Shoemaker, are not accurately or fully stated in the bill. It is satisfactorily shown that while Ellicott, as Manning's assistant, conducted preliminary surveys, located the line of the tunnel and the railroad, and aided in the preparation of specifications, his work, in that respect, was done before the letting to the contractors, and was approved and adopted by the chief engineer. There is no ground to suspect, much less believe, that, in these preliminary matters, any undue advantage was given, or was intended to be given, by Ellicott to the contractors. Before the proposals were received, and before the advertisement for letting, Manning returned to Baltimore, and thereafter personally performed the duties of chief engineer. He was present at the opening of the bids, and personally examined the proposals. In the letting of the work, the company's officers acted upon their own judgment, and without suggestion or advice by Ellicott. The latter had no business relations with Dull, Wiley, or Andrews, either when they bid for the work or when it was let to them.

Some time after the company had made its contracts with Dull, Andrews, and Wiley, the latter proposed to Shoemaker, a gentleman of large means, that he should have an interest in the profits to be made, in consideration of his furnishing

some money in the nature of capital. Shoemaker having the utmost confidence in Wiley's judgment and integrity, verbally accepted this proposition. At an early period in Shoemaker's life he had received valuable assistance from some of the older members of Ellicott's family. This circumstance caused him to feel kindly to Ellicott; and when the latter, at the close of the recent war, returned with his family to Baltimore, laboring under serious financial embarrassment, Shoemaker had a strong desire to sustain him in his efforts for a livelihood, and did assist him in various ways. In his answer, Shoemaker states: "And when the said Wiley, unexpectedly to this respondent, proposed to allow him an interest of one-third in the profits from the said contract, this respondent, without attempting to estimate the probable amount of such share of profits, and, in fact, wholly uncertain whether there would be any profits or not, mentioned the fact of said Wiley's promise aforesaid to said Ellicott, and at the same time told him that if anything came of it he would let him, Ellicott, have one-half of what this respondent should so receive. There was no contract or agreement of any kind between said Ellicott and this respondent on the said subject. Whatever benefit there might be in the offer or promise to share what might never exist, it was made by this respondent, and, as this respondent is well assured, was accepted by the said Ellicott, merely as an act of kindness on this respondent's part, without one thought of any relations existing between the said Ellicott and the Union Railroad Company. Had this respondent been base enough to endeavor to bring about a breach of trust on the part of one in the service of the complainant, as imputed in the bill of complaint, it would have been impossible for him to have thought of presenting unworthy inducements of this sort to a gentleman of the unblemished reputation of Mr. Ellicott, an intimate friend of this respondent himself, and one for whom, on account of his character and personal qualities, he entertained and had manifested a high and sincere regard." These statements are substantially repeated in the deposition of Shoemaker, and we do not doubt their accuracy. Ellicott, referring to Shoemaker's offer, says in his answer: "This

respondent thanked the said Shoemaker for his kindness, and accepted it without imagining that there was anything in the relation he temporarily occupied to the said chief engineer to make it improper, or even questionable so to do."

Under the foregoing arrangement between Shoemaker and Ellicott, the latter received different sums from the contractors, aggregating $13,698.14. His employment by Manning was in the fall of 1870. It continued only for about a year, and ended nearly two years before the completion of the work in question. So far from the interviews with parties proposing to make bids, the contracts founded upon the accepted bids, or the general superintendence of the work for some months from its commencement being left almost entirely with Ellicott, (as alleged in the bill,) he swears in his answer — and the evidence is substantially to the same effect — that Manning returned from Ohio before the letting of the work; approved the specifications; was present to give all requisite information to persons making inquiries with a view to proposals; gave such information and performed the whole duty of chief engineer in connection with the making of the contracts; had the sole and exclusive superintendence of the work from the very commencement, the immediate direction thereof being devolved upon Mr. Kenly, the resident engineer; and that he, Ellicott, had no charge of it whatever. He also states in his answer — and the statement is sustained by the evidence — that he "gave no instructions to the contractors, made no measurements or estimates of any of their work, exercised no authority over them, and had no part at all in the construction of the said railroad and tunnel, his whole work being either preliminary to the advertisement for proposals or office work wholly unconnected with the contractors or their compensation."

Taking the whole evidence together, the utmost which can be said is that Ellicott acquired or accepted an interest in the profits of construction contracts that were made while he was in the employ of the chief engineer. But as he had no such interest when the contracts were made; as he did not represent the company in the making of the contracts; and as he

had no connection, while in the service of the company or of its chief engineer, with the supervision and control of the work under the contracts, or with the ascertainment of the amount due the contractors, it is not perceived that his mere acceptance of part of the profits awarded to Shoemaker affords any ground in equity for setting aside either the award of 1876 or the judgment entered pursuant thereto.

The complainant attaches great consequence to the fact that Ellicott was presented and sworn before the arbitrators as a disinterested witness on behalf of Dull, and contends that upon his testimony, mainly, if not entirely, the arbitrators allowed the claim of Dull, based upon an allegation in the change of the model for the construction of the tunnel, to which change Ellicott testified. It is sufficient, upon this point, to say that there is an entire failure to discredit the testimony of Ellicott before the arbitrators. There is nothing to show that he did not state what he believed to be true, and, according to the weight of evidence, all that he stated before the arbitrators was, in fact, true. Besides, it is satisfactorily shown that a very small part of the sum awarded to Dull was on account of the claim based upon the alleged change of the model for the construction of the tunnel. Under these circumstances, the fact that the arbitrators were unaware of Ellicott's arrangement with Shoemaker affords no ground to set aside the award.

The relief which the appellant seeks is entirely wanting in equity. The company has had possession of the work done by the contractors since its completion in 1873. The contracts in question have been fully executed, and restoration of the parties to their original rights has become impracticable, if not impossible. Nevertheless, the company, holding on to all it has received, asks the court to declare void not only the award of 1876, the judgment of 1877, and the unpaid notes given in payment of that judgment, but the original construction agreements of 1871, and give a decree for a return of all that it paid in cash or on the notes guaranteed by the Canton Company; and this, without suggesting fraud upon the part of the arbitrators, or proving that it has been injured, pecuniarily, by

anything that either the contractors or Ellicott did or said. The case comes within the rule laid down by this court in *Atlantic Delaine Co.* v. *James*, 94 U. S. 207, 214, where it was said : " Cancelling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured by them."

*The decree is affirmed.*