EMMA J. ELDRIDGE, ADMINISTRATRIX *vs.* ANNIE B. MAY.

Penobscot.    Opinion May 1, 1930.

114

Cyrus Small,
Nathaniel Tompkins, for plaintiff.
Adolphus Crawford, Jr.,
Hinckley, Hinckley & Shesong, for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRINGTON, JJ.

STURGIS, J. General motion for a new trial in action by the plaintiff as Administratrix of the estate of her husband, Amos L. Eldridge, late of Ossipee, N. H., to recover moneys in the possession of his sister, the defendant, claimed to have been paid her by the deceased under an agreement for his support and maintenance.

The declaration is in assumpsit for money had and received, with specifications, filed under Rule XI, setting out as matters to be proved, that the plaintiff's intestate, having $8,537.15 on deposit in the savings departments of five banks, withdrew all of the moneys, and the defendant, by undue influence, wrongfully and fraudulently obtained possession of the moneys and appropriated them to her own use.

The defendant pleaded the general issue with a brief statement denying the plaintiff's allegations of undue influence and fraud, and saying that she is the owner of the moneys withdrawn from the banks under a contract for support and maintenance made with her brother on November 6, 1928.

At the trial below, the case turned on the validity of this contract. The moneys in question admittedly came into the defendant's possession. Her rights under this contract are her only defense to this suit. The contract reads:

THIS MEORANDUM OF AN AGREEMENT made and entered into this sixth day of November, A. D., 1928, by and between Amos L. Eldridge, formerly of Ossipee in the State of New Hampshire, now of Island Falls in the County of Aroostook in the State of Maine, and Annie B. May of said Island Falls:

WITNESSETH; That whereas the said Eldridge has this day assigned. transferred, granted, set-over, and delivered to the

said May all of his personal estate and chattels, of any and every name and nature, whatsoever, in the State of Maine, including all deposits of money in any banking institution in said States of Maine and New Hampshire belonging to said Eldridge, To HAVE AND To HOLD to her, the said Annie B. May, her heirs, executors, administrators, and assigns, forever.

Now, THEREFORE, the said Annie B. May, for and in consideration of the aforesaid grant to her by the said Eldridge, does hereby agree with the said Eldridge, that she and her heirs, executors, administrators, and assigns, will well and truly support and maintain him, the said Eldridge, in some suitable and proper place to be designated by her, for and during the term of his natural life, and him provide with food, drink, lodging, and clothing, suited to his degree and station in life, also with proper medicine, medical attendance, and nursing whenever required; and that she will treat him at all times with courtesy, kindness, and consideration, and at his death cause him to be decently interred in the cemetery at said Ossipee where his father and mother are buried.

This action for money had and received is equitable in spirit and purpose. It lies for money obtained through fraud, duress, extortion, imposition, or any other taking of undue advantage of the situation of the plaintiff's intestate. If the defendant is proved to have in her possession money which in equity and good conscience she ought to refund, the law will conclusively presume that she has promised to do so. *Mayo* v. *Purington*, 113 Me., 452. As a general rule, any set of facts, which would, in a court of equity, entitle the plaintiff to a decree for the money here in question, if that were the specific relief sought, will entitle her to recover it in an action for money had and received. *Bither* v. *Packard*, 115 Me., 306, 313. This action is governed by equitable principles.

Fraud in equity includes all willful or intentional acts, omissions, and concealments which involve a breach of either legal or equitable duty, a trust or confidence, and are injurious to another or by which an undue or unconscientious advantage is taken over another. 2 Pomeroy's Eq. Jur., Third Ed., Sec. 873; 1 Story's Eq. Jur., Sec. 187.

Undue influence is a species of constructive fraud and the doctrine of equity concerning it is very broad. Whenever two persons have come into such a relation that confidence is necessarily reposed by one and the influence which naturally grows out of that confidence is possessed by the other and this confidence is abused or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage although the transaction could not have been impeached if no such confidential relation had existed. The principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and a resulting superiority or influence on the other. Pomeroy's Eq. Jur., Sec. 956.

The term "fiduciary or confidential relation," as used in the law relative to undue influence, is a very broad one. It embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The relations and duties involved in it need not be legal but may be moral, social, domestic, or merely personal. Pomeroy's Eq. Jur., Sec. 956; 2 Words and Phrases, Second Series, 529.

And the rule seems to be that, whenever a fiduciary or confidential relation exists between the parties to a deed, gift, contract, or the like, the law implies a condition of superiority held by one of the parties over the other, so that in every transaction between them, by which the superior party obtains a possible benefit, equity raises a presumption of undue influence and casts upon that party the burden of proof to show affirmatively his compliance with equitable requisites and of entire fairness on his part and freedom of the other from undue influence. *Burnham* v. *Heselton*, 82 Me., 495; *Connor* v. *Stanley*, 72 Cal., 556; *Todd* v. *Grove*, 33 Md., 188; *Cowee* v. *Cornell*, 75 N. Y., 91; *Gugel* v. *Hiscox*, 122 N. Y. S., 557; Pomeroy's Eq. Jur., Sec. 956; 6 R. C. L., 637.

This rule has been often applied to transactions between brothers and sisters, brothers and brothers, and sisters and sisters. Their relations may be of such reciprocal confidence as to cast upon either the burden of proof to show the exact fairness of a transaction between them by which either is benefited. In such cases where

this burden has not been sustained, equity has set the transaction aside. *Merriman* v. *Jones*, 126 Me., 130; *Million* v. *Taylor*, 38 Ark., 428; *Gillespie* v. *Holland*, 40 Ark., 28; *More* v. *More*, 133 Cal., 489; *Birdsong* v. *Birdsong*, 2 Head, 289, 299; *Todd* v. *Grove*, supra; *Shevlin* v. *Shevlin*, 96 Minn., 398; *Thornton* v. *Ogden*, 32 N. J. Eq., 725; *Watkins* v. *Brant*, 46 Wis., 419.

Even a summary of the evidence must be unduly long. The record is voluminous, and the story of the defendant's relations with her brother must be drawn from a series of events and circumstances covering a somewhat lengthy period. The case comes forward on a motion for a new trial. The single question is whether the jury, upon the evidence presented to them, with an opportunity to measure the credibility of witnesses as they appeared upon the stand, and weigh the conflict of testimony as they heard it, were manifestly wrong in their verdict for the plaintiff. It is only necessary, therefore, to determine whether facts and inferences are disclosed by the evidence which, under the rules of law applicable, justify the verdict. We have read and considered the evidence with care and are of opinion that the jury were warranted in the following conclusions:

Amos L. Eldridge, the plaintiff's husband and intestate, in 1928, lived with her at Ossipee, N. H. He owned his home, but, outside of that, the moneys here in question represented his entire life's savings. He was seventy-three years of age, broken in health and somewhat enfeebled in mind. He had valvular disease of the heart and kidney trouble. Dropsy had set in and his legs had become swollen and ulcerated. He was at times helpless, and at all times in a serious condition. His physician testifies that it was uncertain whether he would live for a day or for months, and says that he had become childish and fretty and there was a degeneration of his mental faculties.

The defendant was a younger sister who formerly had lived with her brother at their old home in Ossipee. In those years she was in her brother's closest confidence, writing his letters, handling his moneys, and making his deposits in the bank. They both had married, she moving to Island Falls, Maine, to live with her husband, Levi H. May, and he staying in Ossipee with his wife in a new home

In August, 1928, Mrs. May visited her brother in Ossipee and, unbeknown to his wife, invited him to come to Maine and live with her, although she was advised by his physician that such a removal was risky and would be detrimental to him. She was then advised as to his condition and the uncertainty of his life.

In October, 1928, Mrs. May secretly arranged a meeting with Mr. Eldridge at the home of an older sister, Julia Wormwood, who lived in Rochester, N. H. Mr. Eldridge was brought to Rochester on October 24 by a neighbor, stating to his wife as he left home that he was going down to his sister Julia's to stay over Sunday, and leaving her uninformed of Mrs. May's arrival in Rochester and his proposed meeting with her.

The next day, Mr. Eldridge was taken home by Mrs. Wormwood's husband. He got a cleaning rod from the garage, said he was going to a rifle shoot that afternoon, and unbeknown to his wife, gathered up all his bank books, and left for Rochester again without waiting for dinner.

The next day, October 26, Mr. Eldridge accompanied Mrs. May to Island Falls, Maine. No one appears, outside of Mrs. May, who admits knowledge that the trip was planned. Mrs. Eldridge did not know that her husband had gone to Maine with Mrs. May until nearly a week had passed, assuming all the time that he was in Rochester with Mrs. Wormwood. Frank A. Eldridge, an older brother who lived in Ossipee and was on most friendly terms with Mr. Eldridge, was apparently also kept in ignorance. What Mrs. Wormwood, the older sister, knew does not appear. Her deposition might have shed valuable light upon the events which took place in her home. We are impressed with the view that Mrs. May's dealings with her brother at Rochester, prior thereto and thereafter, were intended to be secret and were effectually kept so.

When Mr. Eldridge arrived at Island Falls, he was still in a most serious condition. The local physician there, called by Mrs. May as early as November 2, found him in bed still suffering from the complication of diseases already described. This Doctor called again November 5 and again on the 7 and 10. At all times, he says Mr. Eldridge was in bed and in distress. We think the evidence fairly indicates that, from the day of his arrival at Island Falls,

Mr. Eldridge progressively grew weaker and it was evident that he could live but a short time.

As already stated, Mr. Eldridge arrived at Island Falls on Friday, October 26. Examining the testimony of Mrs. May, we find that she admits that on the Sunday following she was talking with him about turning over all his property to her in consideration of an agreement for life support. On the next Monday, she says the bank books were turned over to her, and, at Mr. Eldridge's request, she wrote to the five banks holding deposits for withdrawal of all moneys and remittances in currency rather than by check. These letters were admittedly written by Mrs. May, although signed, by signature or mark, by Mr. Eldridge.

The banks having refused to remit under the letters, October 31, Mrs. May called in a local Notary Public and directed him to make out withdrawal orders payable to herself. The Notary testifies that although he read the orders to Mr. Eldridge, asked him if he wanted to sign them, and received an affirmative answer, Mr. Eldridge himself made no conversation regarding them and was able only to sign by a mark.

The next day the Notary came to the May home again to witness a signature card, and Mr. Eldridge's condition was such that the Notary wrote one of the banks this pertinent report of the man's condition:

"I was this day called to the home of Mr. & Mrs. L. H. May to witness to the signature of Mrs. May's brother, Mr. Amos L. Eldridge.

"I found that Mr. Eldridge was in a state of Nervous collapse and was unable to sign his name, and, therefore, I witnessed to his mark as stated on the signature card that you mailed him."

On the next day, the same Notary drew up an order authorizing Mrs. May to sign for any mail or express that came to Mr. Eldridge and to endorse checks payable to his order. This paper was signed by a mark. It was sufficient, however, to enable Mrs. May to obtain possession of the moneys which came from the several banks, all in currency as directed. She immediately deposited the money in her own name in a local bank.

The next proceeding is important. Mrs. May's testimony alone describes it. She says that her husband, Levi H. May, arranged with his attorney, Mr. Crawford, then of Houlton, to draw up a written agreement providing for Mr. Eldridge's support by Mrs. May in consideration of the transfer of all his personal property to her. She states that Mr. May went to Mr. Crawford on November 5 and furnished the latter with the information from which the instrument, here in controversy, was drafted. She received it at Island Falls by mail on the 6th and immediately sent again for the Notary.

We turn now to the testimony of the Notary as to the execution of the contract upon which this case turns. He says:

Q. Now Mr. Young, who provided you with that instrument to secure the signature of Mr. Eldridge? A. They had it there at the house.

Q. Do you recall who gave it to you? A. I do not. I should imagine — I don't know whether Mr. or Mrs. May passed it to me.

Q. And to refresh your recollection, what is the date of it at the top? A. Sixth of November.

Q. Sixth of November? A. Yes sir.

Q. Where did you find Mr. Eldridge that day? A. In bed.

Q. Who was in the room when he made his signature by mark to this paper? A. Mrs. May, I think.

Q. And yourself? A. Yes sir.

Q. Did you read this to him? A. I did.

Q. Did he make any comments or talk about it? A. No sir.

Q. Did you hold the pen for him when he made the mark? A. I did.

Q. And where did Mrs. May sign her name to the paper? A. I think she went out to the desk in the other room.

In cross examination the Notary says the paper was read to Mr. Eldridge twice. He was asked if he understood it and wanted to sign it and said he did. And testifying to no further conversation, the Notary asserts that Mr. Eldridge was clear mentally so far as he observed that day.

As bearing upon Mr. Eldridge's condition, however, on the day that he signed the contract and the part Mr. and Mrs. May were playing in this transaction with Mr. Eldridge, the incidents of the next day, November 7, are significant. On that day, Mr. May summoned the Notary again to the May house and there directed him to prepare a deed conveying Mr. Eldridge's real estate to Mrs. May. The description of the property to be used in the deed was furnished by Mr. May with instructions from Mrs. May, all this being done in a room apart from Mr. Eldridge. The testimony of the Notary in regard to an attempt to obtain Mr. Eldridge's signature is:

Q. And after having prepared the deed, did you take it to Mr. Eldridge's bed chamber? A. I did.

Q. And did Mr. Eldridge sign the deed? A. No sir.

Q. Why not? A. He was as a man awaking from sleep — he could not seem to understand what the statement was.

Q. Did you try to talk with him? A. I did a little.

Q. Could you carry on an intelligent conversation? A. Not that day, no sir.

In this connection it is worthy of note that the contract for support did not call for a conveyance of real estate. And further that two or three days after the attempt to obtain Mr. Eldridge's signature, the deed was brought to the Notary by a son of Levi H. May by a former marriage, who took oath that he had seen Mr. Eldridge subscribe a mark which appeared on the paper.

All this time no word had been sent by Mrs. May to Mrs. Eldridge nor does it appear that relatives in New Hampshire had been informed of Mr. Eldridge's condition. No one but the Mays, the attorney in Houlton, and the Notary knew of Mr. Eldridge's attempted contract and conveyance. The transaction was kept secret until Mr. Eldridge died, four days later on November 11. An examination of his effects at Ossipee then disclosed that the bank books were missing. Inquiry at the banks disclosed the withdrawals.

The defendant's claim is that she received the money in suit from her brother in good faith and without fraud on her part. She testified before the jury that Mr. Eldridge came to her home of his own

volition and without her solicitation. She asserts that his home life in Ossipee was unhappy and he was ill treated by his wife. She told the jury that the transfer of his moneys and lands to her were suggested by him and purely voluntary and in no way influenced by her. The jury were not convinced by her story. They did not find in the evidence before them proof of her good faith and fair dealing in this transaction.

The testimony of Mr. Eldridge's family physician and his brother refuted Mrs. May's charges of ill treatment by Mrs. Eldridge. The secrecy surrounding Mr. Eldridge's departure to Maine, his stay with Mrs. May, and the execution of his contract and conveyance was sufficient to arouse suspicion in the minds of fair minded men. Evidently it did not appeal to reason that a man, without causes more cogent than the evidence discloses, would of his own volition and uninfluenced by the defendant strip himself of all earthly possessions, pauperize his wife, and disinherit his other heirs for a consideration so uncertain and in all probability so inadequate. Mrs. May had been advised by her brother's physician in Ossipee that his span of life might be a day or longer, or to use her own words, that he "was liable to pass out any time." She received substantially the same advice from the local physician whom she called at Island Falls. The jury might well have concluded that Mr. Eldridge's early demise was apparent to anyone who saw him, and that even in permitting him, unadvised by impartial and disinterested counsel, to enter into the contract in question, she took an unconscionable and unfair advantage of him which in equity can not be allowed to stand.

We think the jury were justified in going further and, from all of the evidence in the case, drawing the inference that it was through the influence and persuasion of the defendant that Mr. Eldridge was induced to transfer his moneys and property to her and execute the contract of November 6. We are convinced also that a finding that the influence was undue is not error.

Under the equitable principles stated, the plaintiff was entitled to recover the moneys in the possession of the defendant in this action of general assumpsit.

*Motion overruled.*