**Randell C. EATON et al.**

v.

**Frederick SONTAG et al.**

Supreme Judicial Court of Maine.

June 1, 1978.

Alan C. Pease (orally), Wiscasset, for plaintiffs.

Perkins & Perkins by James Blenn Perkins, Jr. (orally), Boothbay Harbor, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Active Retired Justice.[1]

Randell C. Eaton and Evelyn M. Eaton, the plaintiffs, and Frederick Sontag and

1. Mr. Justice Dufresne sat at oral argument and participated in consultation while he was Chief Justice, and, on order of his successor, Mr. Chief Justice McKusick, was empowered and authorized to continue his participation in the case in his capacity of Active Retired Justice.

Marie Sontag, the defendants, prior to April 18, 1973, had met on social occasions during the period of some fifteen years. During the summer season of 1972 the Eatons operated a campground on Knickerbocker Road, in Boothbay, Maine, which they were in the process of developing. Since Mr. Eaton was working in Connecticut and had three more years to go before he could retire from his municipal employment and it became obvious it would be difficult to secure somebody to carry on the management of the camping business for the upcoming season, the Eatons had decided to dispose of their holdings. They listed the property with area realtors. When the Sontags visited them in Connecticut around the Christmas holidays, the Eatons' campground in Boothbay became a recurrent subject of conversation as the Eatons viewed the Sontags as possible purchasers. Though the Sontags displayed no desire to buy the property at that time, the Eatons pursued their initial overtures in the new year by sending the Sontags plans of the campground project together with complete investment costs to date. They followed this with their own visit with the Sontags in Florida during the first week in March. The sale was consummated on April 18, 1973, when the Sontags accepted a warranty deed of the property for the price of eighty thousand ($80,000.00) dollars, paying twenty-six thousand ($26,000.00) dollars cash and giving their note secured by mortgage for the balance of fifty-four thousand ($54,000.00) dollars payable in three (3) years with interest at the rate of six percent (6%) per annum.

The Sontags took possession of their new acquisition that very day, which was the first time they were viewing the campsite on location. Their maiden summer operation was a complete disappointment as they grossed slightly over four hundred ($400.00) dollars. On September 20, 1973 Mr. Sontag dispatched a letter to Mr. Eaton in which he complained generally that the plaintiffs had overcharged the defendants by more than twenty-five thousand ($25,000.00) dollars and that they had misrepresented their gross revenues for the five (5) weeks of

operation in 1972 when they claimed they had taken in fifteen hundred ($1500.00) dollars. The letter suggested the Eatons should repurchase the property or make an adjustment respecting the balance of the Sontag obligation. By reply letter, Mr. Eaton denied the overcharge claim and any wrongdoing in their dealings with the Sontags. He refused to renegotiate the terms of the existing note and mortgage. The Sontags continued their payments on the note for the months of October and November, but ceased to make further payments on their obligation thereafter.

This precipitated the plaintiffs' complaint for damages dated April 22, 1974 based on five monthly overdue instalments on the note in the aggregate amount of $1620.00, plus interest and costs. By way of counterclaim, the Sontags sought rescission of the sale, cancellation of the note and mortgage, and refund to them of the moneys paid to the Eatons at the closing, on the ground they had been induced to enter into the purchase of the campsite by the fraud of the Eatons.

The parties stipulated that the amount due on the note was $1296.00, and the case was tried before a Lincoln County jury on the counterclaim. The jury returned a unanimous verdict for the plaintiffs in the amount stipulated and judgments were entered in favor of the plaintiffs and against the defendants on the complaint and counterclaim. The defendants have appealed. We deny their appeal.

The charge of fraud which the defendants set out to prove against the plaintiffs as alleged in the counterclaim was that the Eatons misrepresented to them that the campsite was a gold mine; they had taken in fifteen hundred ($1500.00) dollars in five weeks of their first season of operation; there was city water on the premises; the Sontags could live on the premises year-round; also they failed to disclose that the expenditures incurred in the development

of the campground did not reflect the true value of the property.

This Court stated in *Getchell v. Kirkby,* 113 Me. 91, 92 A. 1007 (1915), that

"[a] contract obtained through false and fraudulent representations may be rescinded or affirmed at the election of the party defrauded, and this principle applies to contracts under seal, as well as to other classes of contracts. Deeds [including mortgage deeds] procured by covin or fraud as between the parties, are as dead as forged deeds."

Again, in *Getchell v. Kirkby,* supra, at page 95, 92 A. 1007, at 1008, this Court quoted with approval the rule applied in *Union Railroad Company v. Dull,* 124 U.S. 173, 183, 8 S.Ct. 433, 437, 31 L.Ed. 417 (1888):

" 'Cancelling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured by them.' "

In *Horner v. Flynn,* Me., 334 A.2d 194 (1975), we stated at page 200:

"We think it is the considered policy of the law that a litigant who asserts fraud will be held to fail to meet his burden of proof by a preponderance of the evidence unless he produces evidence having strong capability to induce belief."

Again, expressing the standard of proof in affirmative terms we added in *Horner* that, because of the nature of the issue of fraud in any civil litigation, "evidence will constitute preponderance only if it is clear evidence, convincing evidence and unequivocal evidence." Id. at page 200.

The jury exonerated the plaintiffs from any fraud which induced the defendants to purchase the plaintiffs' campground. From this record, we cannot say that the jury was wrong as a matter of law. The jury could rationally conclude that there was not that qualitative evidence of clear and convincing proof of fraud.

We are aware that we said in *Getchell v. Kirkby,* supra, "rescission does not follow unless the vendee does abandon possession to the vendor." Here, the issue of fraud to support rescission was tried on the theory that the plaintiffs had refused to accept the defendants' offer to reconvey the premises. Without expressing any opinion on the sufficiency of compliance with the reference rule in this case, we will discuss the several points of error raised in this appeal.

The defendants argue on appeal that the past association of the parties as social friends for the period of fifteen years raised their relationship in connection with any business transaction between them to one of a confidential nature, and, under such circumstances, the rule of caveat emptor did not apply, but rather, there existed a duty on the part of the plaintiff vendors to disclose to the defendant vendees the plaintiffs' financial embarrassment by reason of the campground development instead of representing the operation as a gold-mine opportunity. We disagree.

We agreed in *Ruebsamen v. Maddocks,* Me., 340 A.2d 31 (1975) that the "fiduciary or confidential relation" concept when used in connection with improper influence affecting the validity of some transaction was one of broad application and that it embraced not only technical fiduciary relations such as may exist between parent and child, guardian and ward, attorney and client, etc., but may also encompass relationships wherein confidence is actually reposed in another by reason of their social ties, citing *Eldridge v. May,* 129 Me. 112, 150 A. 378 (1930).

In *Eldridge,* we recognized that

"[f]raud in equity includes all willful or intentional acts, omissions, and concealments which involve a breach of either legal or equitable duty, a trust or confidence, and are injurious to another, or by which an undue or unconscientious advantage is taken over another."

But, in *Ruebsamen,* we said that

"[t]he salient elements of a confidential relation are the actual placing of trust and confidence in fact by one party in another *and a great disparity of position and influence* between the parties to the relation." (Emphasis supplied) Id. at page 35.

"[M]ere kinship itself [mere friendship itself] does not establish a confidential relation; *often relatives* are hostile to each other or *deal at arm's length and act independently and so are held not to have been a confidential relation.*" (Again, emphasis supplied) Id. at page 35.

"[E]ven where specific facts tend to show intimate dealings, as between family members or friends, the existence of a confidential relationship remains a question of fact and need not be imposed by law. If the parties to a transaction are of mature years and in full possession of their faculties, their continuing lifelong relation as sisters-in-law and friends will not give rise to a confidential relation as a matter of law unless there is evidence of superior intellect or will on the part of the one or the other, or of trust reposed or confidence abused." Id. at page 35.

See also, *Chandler v. Dubey*, Me., 325 A.2d 6 (1974); *Atlantic Acoustical & Insulation Co. v. Moreira*, Me., 348 A.2d 263 (1975).

■ The authorities do agree that friendship between the parties to a transaction in itself is not sufficient to show a confidential relation. *Carpenter & Carpenter v. Kingham*, 56 Wyo. 314, 109 P.2d 463, 475 (1941); *Cox v. Schnerr*, 172 Cal. 371, 378, 156 P. 509, 512 (1916).

■ The expression "confidential relation" characterizing the status of persons inter se has a comprehensive meaning and application as stated previously and may vary in reference to the particular relationship involved, but it has not been construed to include the relationship of vendor and vendee or seller and purchaser merely because the parties to the transaction had known each other for some time and both or either were favorably impressed with the other.

■ The evidence here fails to disclose any particular dependence of one party upon the other's judgment for business transactions during their acquaintanceship of fifteen years. That one had developed a reliance on the other in a business way does not appear in this case. The Sontags did not act precipitously. Their first encounter with the plaintiffs' offer of sale was negative. They took time for deliberation of the proposal. They had full opportunity for disinterested consultation before reaching their decision to purchase the campground. That the parties believed in their mutual honesty, sincerity and truthfulness on account of their social intercourse is not sufficient to constitute a confidential relationship as the term implies in the law of undue influence vitiating contracts. See *Boettcher v. Goethe*, 165 Neb. 363, 85 N.W.2d 884 (1957).

■ The Sontags claim they were deceived, because the Eatons failed to advise them that the amount of expenditures already incurred in the campsite project as listed and furnished to them in the preliminary stages of the negotiations did not reflect a true picture of the value of the property. Such resulting misconception of the value of the premises inferred by the Sontags from the Eatons' actual investment in the campground development, the amount of which stands undisputed in the evidence, would not constitute actionable fraudulent conduct on the part of the plaintiffs. In the absence of false representations of fact respecting the actual expenses incurred in the development, there would be no actionable fraud, for misrepresentations as to value and quality of land made by the vendor, even though made with fraudulent intent, are not actionable. *Holbrook v. Connor*, 60 Me. 578 (1872). Such representations of value are "dealer's talk." See *Bishop v. Small*, 63 Me. 12 (1874); *Davis v. Reynolds*, 107 Me. 61, 77 A. 409 (1910).

■ The assertion that the campsite operation is a gold mine was, and should have been understood to be, but the use of extravagant language of the class known to every man of ordinary experience as "deal-

er's talk," i. e. "that picturesque and laudatory style affected by nearly every trader in setting forth the attractive qualities of the goods he offers for sale," and this even among friends. But such is not actionable. See *Prince v. Brackett, Shaw & Lunt Company*, 125 Me. 31, 34, 130 A. 509, 511 (1925). The law recognizes the fact that sellers may naturally overstate the value and quality of the articles or property which they have to sell. Everybody knows this, and a buyer has no right to rely upon such statements. See *Kimball v. Bangs*, 144 Mass. 321, 11 N.E. 113 (1887).

Since an express statement by the Eatons that their property was worth eighty thousand ($80,000.00) dollars, the selling price, or more, would not be actionable fraud, but merely an opinion of the sellers which the buyers must expect to be likely inflated as puffing or dealer's talk, their failure to disclose the alleged fact, if true, that the actual investments in the property did not reflect the true value of the property would also not be actionable fraud.

■ Furthermore, it is not fraud for one party to say nothing respecting any particular aspect of the subject property for sale where no confidential or fiduciary relation exists and where no false statement or acts to mislead the other are made, as was the case here. *Amend v. Hurley*, 293 N.Y. 587, 596, 59 N.E.2d 416, 419 (1944).

■ Every man has the right to ask any price he sees fit for the wares or lands he has to sell and the matter of fixing the price, even for friends who might be interested in their purchase, may be predicated upon divers bases, one of which may be what he thinks he can get for it from a prospective purchaser. To seek a price commensurate with one's investment in the property would not only be non-fraudulent in itself, but mere good business acumen.

■ The claim of fraud based on the alleged falsity of the plaintiffs' statements that the gross revenues for five weeks of operation in the summer of 1972 were fifteen hundred ($1500.00) dollars, that there was city water on the premises, that the Sontags could live on the premises year-round, that the property had been listed for sale with an area realtor for $90,000.00, failed for want of evidence of any falsity therein.

The defendants claim error in the Court below, because they were not permitted to show through the contractor who converted the area land into the campsite project under Mr. Eaton's supervision that the Eatons had invested a great deal more money than anticipated and that they would have to spend more than they had planned to complete the development, to the extent they were disturbed and had not paid the contractor for his work. The defendants contend that the plaintiffs' financial embarrassment was admissible as evidence of motivation for fraud in proof of fraudulent intent and conduct in the transaction. This claim of error has no merit.

■ Ordinarily, the financial status of the parties, whether it be impecuniousness of affluence, or as in this case, monetary embarrassment, is a collateral matter not to be inquired into in the trial of a law suit, but, when relevant to the issues in the case and material, evidence tending to prove the pecuniary condition of a party might be received, its admissibility or exclusion resting largely in the exercise of a sound judicial discretion on the part of the trial judge.

■ Both relevancy and materiality of a party's pecuniary condition, and, hence, its admissibility in evidence, depend on the circumstances of the particular case. "Relevancy of evidence is dependent on probative value and the determination whether evidence is relevant and material must necessarily rest largely in the sound discretion of the presiding justice as of the time it is offered." *State v. Eaton*, Me., 309 A.2d 334 (1973); *Towle v. Aube*, Me., 310 A.2d 259 (1973); *McCully v. Bessey*, 142 Me. 209, 49 A.2d 230 (1946); *Torrey v. Congress Square Hotel Co.*, 145 Me. 234, 75 A.2d 451 (1950).

Under the rule, evidence of an accused's financial embarrassment or lack of money as a motive for the commission of crime has been admitted under certain circumstances.

See *State v. Lytle,* 214 Minn. 171, 7 N.W.2d 305 (1943); *Parsons v. State,* 251 Ala. 467, 38 So.2d 209 (1948); *Carciofolo v. U.S. Fire Insurance Company,* 38 A.D.2d 672, 327 N.Y.S.2d 141 (1971).

But some authorities have excluded such evidence on the ground that the desire of gain as a motive for the commission of crime has influenced the conduct of rich persons as well as poor persons. In *Reynolds v. State,* 147 Ind. 3, 46 N.E. 31, at 33, the Court said:

"Men do not rob or steal except as they have a desire to do so, but such desire does not come so much from the poverty of the individual, as from the absence of a moral sense, and from the desire to possess at all hazards something that does not belong to him."

In *Commonwealth v. Jeffries,* 7 Allen 548, at 566 (Mass.1863):

"The reason for the exclusion of such evidence [of the poverty or pecuniary embarrassments of a party accused of crime] is, that in those cases there is no certain or known connection between the facts offered to be proved and the conclusion which is sought to be established by it. To render evidence of collateral facts competent, there must be some natural, necessary or logical connection between them and the inference or result which they are designed to establish. It does not follow because a man is destitute that he will steal, or that when embarrassed with debt and incapable of meeting his engagements he will commit forgery. The conclusion in such cases is too remote and uncertain a deduction to be legitimately drawn from the premises."

\* \* \* \* \* \*

"Evidence of the pecuniary condition of the accused in such a case [obtaining property under false pretense] is not offered to show that he was under a peculiar temptation to commit the offence, or was more likely to cheat and defraud because he was in embarrassed circumstances, but for the purpose of showing the natural and necessary consequence of his act, which the law presumes he intended." Id. at page 569.

Generally speaking, there must be something more than mere poverty of an accused to tie him to criminal activity. *State v. Mathis,* 47 N.J. 455, 221 A.2d 529, 538 (1966).

In *Fitzmaurice v. McGinn, Executor,* 131 Me. 496, 162 A. 701 (1932), our Court ruled as admissible, in view of the circumstances and developments of the case, the plaintiff's financial responsibility at the time of the alleged contract in proof of the contractual undertaking. In *Fitzmaurice,* there was no dispute that the plaintiff had paid the premium of an insurance policy taken out on the life of the deceased, and the Court viewed the plaintiff's condition of affluence as tending to corroborate the existence of the contract claimed to have been made in relation thereto, the pecuniary status of the plaintiff giving character to the plaintiff's act in paying the insurance premium, and in support of the reasonableness of his conduct. See *Wheelden v. Wilson,* 44 Me. 11 (1857); *Covanhovan v. Hart,* 21 Pa. 495 (1853).

In the instant case, however, where the evidence is wanting in proof of any misstatement or misrepresentation respecting any material part of the parties' negotiations prior to the execution of the sale of the campground, the mere fact that the plaintiffs may have been embarrassed financially by reason of their monetary overextension in the development of the project, without proof of some other circumstance of colorable or deceitful conduct, did not justify the Sontags' ex post facto suspicion that, to improve their financial condition, the Eatons were motivated by dishonest design and did perpetrate a double-cross on friends of fifteen years standing.

The defendants further contend there was reversible error when the Justice below refused a request to withdraw their exhibit no. 5, which had previously been admitted without objection, when it appeared that exhibit no. 5 was introduced by mistake instead of defendants' exhibit no. 14. Both exhibits were identical plans of the campsite project.

There was no error as the withdrawal of evidence is discretionary with the trial court and there was no abuse of discretion in this instance. Furthermore, since the exhibits were identical, the ruling, even if erroneous, would have been harmless. See *Jones v. Spidle,* 446 Pa. 103, 286 A.2d 366, 368 (1971); *Bell v. Incorporated Town of Clarion,* 120 Iowa 332, 94 N.W. 907, 908 (1903).

 Evidence, once given, belongs to the cause, and is the common property of all the parties and may not be withdrawn as a matter of right by the party who introduced it. *Maas v. Laursen,* 219 Minn. 461, 18 N.W.2d 233, 235 (1945).

Many other points of error were raised. We have considered each one, but on this record we find no merit in any one of them.

The entry will be

Appeal denied.

Judgment for the plaintiffs, Randell C. Eaton and Evelyn M. Eaton, on the main action and on the counterclaim affirmed.

WEATHERBEE, J., sat at oral argument and participated in conference, but died prior to the preparation of the opinion.

DELAHANTY, J., did not sit.