Essex County Juvenile and Domestic Relations Court.

BESSIE RICH, COMPLAINANT, v. WALLACE D. RICH, DEFENDANT.

Dated March 4, 1934.

For the complainant, *Thomas Brunetto.*

For the defendant, *Nathan A. Whitfield.*

Siegler, J. This action is based on a complaint under the second section of an act entitled "An act to establish Juvenile and Domestic Relations Courts, defining their jurisdiction, powers and duties and regulating procedure therein" (Revision of 1929; *Pamph. L. 1929, ch. 157, pp. 274, 275*), alleging that the defendant has failed and neglected to support the complainant and their child for several years. The second count of the complaint is brought under an act entitled "An

act for the settlement and relief of the poor." *Pamph. L.* 1924, *ch.* 132, and the supplements thereto and amendments thereof. The evidence is more directly confined to that part of the complaint which embraces the first count, and for that reason it will be discussed first.

The complainant is required, in order to succeed in this action under the first count, to bring her proof well within the provisions of the Juvenile and Domestic Relations Court act, *supra,* which is set forth in the following language. *Pamph. L.* 1925, *p.* 275:

"It shall have jurisdiction to hear and determine in summary manner, disputes involving the domestic relation where the gravamen of the complaint is the *failure to provide support or adequate support."* (Italics mine.)

I find the following facts to be established:

Complainant and the defendant were married on April 15th, 1922, at Houston, Texas. Complainant is a graduate nurse and the defendant is a practicing physician. After their marriage they both practiced their respective professions and lived by their joint earnings.

The defendant experienced considerable difficulty in making a permanent domicile where he could build up his own medical practice, and therefore went from place to place as resident physician, obtaining employment on several occasions at mental hospitals.

No children were born of this union. Complainant and defendant, however, appeared to have had a great desire to complete their marital happiness, and proceeded to obtain a child from a child-caring institution, with the intention of adopting the child and making it part of their own family responsibility. On October 27th, 1924, the complainant and defendant entered into an agreement with the Children's Home Society of West Virginia to take an infant then with the institution, and agreed to faithfully provide for its well-being, physical, mental and moral, in all respects as their own child, or return the child to the custody of the society. Shortly thereafter the terms of the agreement were put into effect and the child contemplated under the agreement was placed in the

custody of both of these parties and remained with them until 1925, when by arrangements suitable to this defendant the child was left with a Mrs. Murphy of New York City, mother of the complainant, where the child has ever since resided, and by whom he has ever since been supported and maintained.

The complainant and the defendant lived quite happily together for the greater part of their married life, the complainant keeping the center of the stage, so to speak, she being able to earn more than her husband. For a long period of time, until 1929, she was furnishing the entire income which went for the care and maintenance of both the complainant and the defendant.

On January 15th, 1929, the defendant obtained a position as resident physician at the Essex County Hospital at Overbrook, New Jersey, at a salary of $200 a month and maintenance, which has since been increased to $220 a month and maintenance. The complainant at that time was employed as a nurse at White Plains, New York, and continued to be so employed, without any provision being made by the defendant for her support and maintenance, or for a definite place for both of them to live, either at the hospital or away from it. I take it that the defendant desired his wife to continue nursing and depend upon her own exertions for support, for there is nothing in the evidence that indicates in the slightest degree a desire or an effort on his part to contribute to the support, maintenance or care of his wife after he obtained this employment at the Overbrook Hospital. In fact, he permitted his wife thereafter to live with her mother in New York City and at Asbury Park, New Jersey, without any request or demand on his part to have his wife make her home with him.

There is nothing in the evidence to indicate that there was any substantial disturbance or dissatisfaction existing between the complainant and the defendant, except that the defendant was satisfied to leave well enough alone, and so long as he was not disturbed in his peace and quiet, he was content and satisfied with this method of living. This attitude is supported by the defendant's letter (*Exhibit C-2*)

dated May 20th, 1929, in which he writes to his mother-in-law, Mrs. Murphy, expressing the kindliest feeling and interest for his wife, child, and family in general. There is evidence that the complainant expressed on many occasions the hope that she and the defendant would live together, indicated a definite desire to live with him when he was ready to receive and provide for her. Something happened at this time, however, which changed the whole situation between these parties. In the early part of August, 1929, the complainant met with a very serious automobile accident in Asbury Park, New Jersey, from which she suffered a severe concussion of the brain and was confined in an Asbury Park hospital for about four weeks. The defendant, upon getting notice of this immediately took charge of the matter and rendered such aid and advice as the occasion demanded. He finally determined to remove complainant from this hospital, and at his direction and under his personal supervision the complainant was brought to the Essex County Hospital at Overbrook, where the defendant was living and employed. She remained as a patient at this hospital until March, 1930, during the whole of which time the defendant was with her, directing and advising the necessary medical care that she required. Complainant thereafter with the defendant's approval was removed to the Neurological Hospital in New York City, where she was placed under treatment for several weeks during which time the defendant visited her. The defendant, instead of making arrangements to take his wife back to his place of abode, took no further part or interest in the care of his wife, and permitted her to shift for herself. Finding herself without her husband's invitation to go home with him, and having no other place to go, her mother, Mrs. Murphy, undertook the responsibility of having her come to her home in New York City, where she has lived ever since, except for a few days in November, 1933, when she attempted to make her home in Caldwell, New Jersey.

The complainant was determined to live with her husband at the Overbrook Hospital, and in July, 1930, went there with her belongings, with the intention of staying with her

husband, but he failed to provide the necessary accommodations, and she was again obliged to go back and live with her mother in New York City.

In April, 1931, the complainant in this action instituted a suit in the Court of Chancery charging abandonment under the twenty-sixth section of the Divorce act. The defendant denied the abandonment and set up a counter-claim praying for divorce on the ground of desertion. The matter was referred for final hearing to Advisory Master Van Winkle, who heard the case in June, 1933. The bill of complaint was dismissed without prejudice, and the defendant's petition for divorce was also dismissed without prejudice. One week later the complainant came to the Overbrook Hospital, where her husband was living and employed, and brought her personal belongings, with the intention of staying with her husband and resuming her marital relationships. He refused to accept her and peremptorily dismissed her in the following language, "no you cannot live here." Dr. Payne, the superintendent of the institution, spoke to the defendant. The complainant said that she was determined to stay, and the defendant said, "well, I will call the police and put her out. I will not have any disturbance in the hospital. I cannot lose my position." There she was with one of two alternatives—either to stay there and subject herself to arrest by the police, as the defendant threatened, or to leave the hospital peaceably and content herself with returning to her mother's home. She adopted the latter course. This action was commenced the November following.

It is well at this point to clearly understand what a marriage relationship should mean to persons who assume this sacred responsibility. Marriage carries with it definite obligations and responsibilities. It is that act by which a man and woman unite for life with the intent to discharge toward society and one another those duties which result from the relation of husband and wife. It is frequently said in this country that marriage is nothing more than a civil contract. That it is a contract is doubtless true to a certain extent, as the law always presumes two parties of competent understanding enter into a mutual agreement which becomes exe-

cuted, as it were, by the act of marriage. But this agreement differs essentially from all others. This contract of the parties is simply to enter into a certain status or relation. The rights and obligations of that status are fixed by society in accordance with the principles of natural law, and are beyond and above the parties themselves. They may make settlements and regulate the property rights of each other, but they cannot modify the terms upon which they are to live together, or superadd to the relation a single condition. Being once bound they are bound forever. Mutual consent as in all contracts brings them together, but mutual consent cannot part them. Death alone dissolves the tie, unless the legislature, in the exercise of a rightful authority, interposes by general or special ordinance to pronounce a solemn divorce. So in other respects the law of marriage differs from that of ordinary contracts. Likewise here, so long as the marriage relationship exists, there is a common law responsibility imposed upon the husband to support and maintain his wife and family if he is able to do so. This duty of the husband to support his wife does not rest on contract but springs from the matrimonial relation. This is based on considerations of public policy. See *Irwin* v. *Irwin,* 88 *N. J. Eq.* 139; 102 *Atl. Rep.* 440; *affirmed,* 88 *N. J. Eq.* 596; 103 *Atl. Rep.* 1052; *Boehm* v. *Boehm,* 88 *N. J. Eq.* 74; 101 *Atl. Rep.* 423.

The defendant's main contention is that the dismissal of complainant's bill for maintenance in the Court of Chancery was *res adjudicata* of her rights here, and therefore this complaint should be dismissed. Assuming, but not admitting that this statement is a correct pronouncement of the law, it must be noted that the bill in the Court of Chancery for maintenance under the twenty-sixth section of the Divorce act was dismissed without prejudice against the complainant, and while all matters pertaining to that action are considered disposed of, it does not include any matter or action that may arise since the dismissal of the bill. *Dowling* v. *Dowling,* 93 *N. J. Eq.* 159; 150 *Atl. Rep.* 378. Upon the dismissal of the complainant's bill in the Court of Chancery, every cause of action which was matured at the time she filed the bill was *res adjudicala.* This also applies to the defendant's

petition for divorce, which was likewise dismissed without prejudice. And further assuming that this rule is applicable to an action like this one under consideration, this rule does not apply to any new rights that may accrue to the complainant since the dismissal of the bill, because these are without prejudice. If it can be said that the complainant up to and including the time of the filing of her bill in the Court of Chancery was not entitled to relief under the twenty-sixth section of the Divorce act, then certainly when she offered herself back to her husband in June, 1933, to live with him as husband and wife, and this offer having been made in good faith, she certainly had restored the marital status and succeeded in converting that which appeared to be a breach of that status by her into a performance which would entitle her to be restored to all her rights and privileges as the wife of the defendant. And if this defendant took it upon himself to refuse to admit her into the marital relationship as she demanded, and to which she was entitled under the existing law, he became the wrong-doer from that time on and not the complainant. Having failed to support her since that time, in addition to having refused to permit her to live in his home with him, the desertion is his since that time and not hers.

This discussion is with relation to the rights of these parties under the Divorce act, which it will be noted is a different kind of a remedy than that which is contemplated under the act which is being considered now. The objective under the Divorce act is to obtain a dissolution of the marriage, which would terminate the relationship between the parties, while under this act it is intended that the common law liability of a husband to support and maintain his wife and family shall continue until there is a dissolution of the marriage status in a court of competent jurisdiction. Examining authorities on this problem I have found very apt language which supports this principle in *Bates* v. *Bates, 2 N. J. Mis. R.* 400. Vice-Chancellor Leaming, dealing with a similar situation, except that he was deciding an action under the twenty-sixth section of the Divorce act, held:

"I am unable to see how there can be any denial by the court of the complainant's demand for support without over-

ruling the Court of Errors and Appeals, and that I never knowingly attempt. The Court of Errors and Appeals has said, and said very emphatically, that the common law obligation of support resting upon a husband is a dual obligation, he owes it to his wife and he owes it to society, and that obligation, the courts say, persists and continues—to use the exact language of the court, 'unless and until' the husband shall divorce her. In the overruled case, in which that comment was made by the Court of Errors and Appeals, the woman had been admittedly living in open adultery with another man; the husband had not seen fit to procure a divorce from her, which he could have procured, and yet the Court of Errors and Appeals determined that, unless and until he should procure a divorce from her, he must provide for her support. If a husband doesn't wish to provide for the support of his wife, it would seem that he must procure his divorce and thus terminate his common law obligation of support. Two early decisions in this state had been referred to in the overruled case, which held that a husband was not obliged to support his wife if she refused to live with him and share his home. As to those cases the Court of Errors and Appeals intimated a disapproval by characterizing the rulings as *obiter dictum*." See *Van Oslin* v. *Van Oslin,* 2 *N. J. Mis. R.* 897.

It therefore follows that if the defendant has a cause of action under the Divorce act, that entitles him to a dissolution of the marriage, he cannot by delaying the enforcement of that right deprive his wife of the right of support, for only upon dissolution of the marriage does his responsibility to support her cease. *Bates* v. *Bates, supra.*

Finding as I do (1) that the complainant has stood ready and willing to live with her husband and perform her marital responsibilities; (2) that she has committed no matrimonial offense which justifies the defendant in withdrawing from the marital relationship; (3) that the marriage relationship between these parties exists; (4) that the defendant has failed and neglected for several years to support and maintain the complainant, and (5) that the defendant has failed adequately to support his wife, the complainant has established

her case against the defendant on the first count and is entitled to the relief prayed for.

Having found as I do in favor of the complainant on the first count, it is not necessary, for the purpose of this action, to make any determination with regard to the second count. Whatever relief the complainant is entitled to she will be adequately cared for under the first count.

With respect to the support of the child, I find that the responsibility for the last few years and at the time of this action was assumed by Mrs. Murphy, who is regarded by the child as the grandmother, and for the purpose of this action there is no duty upon complainant to support this child. The child is not in need, and the evidence has not satisfied me that he requires the support of anybody but the person who is now taking care of him. There will be no allowance for the support of the child.

In fixing the amount for the support of a wife, we are governed by the principle that the support which the husband must furnish is such as is reasonable and suitable to his condition and station of life and according to his means. The common law duty of a husband to support his family has not been changed by the legislation relating to married women, nor is he relieved from liability because the wife has adequate means of her own or a separate estate. This principle has been the universal rule and has been adopted by text writers. *Madden on Persons and Domestic Relations* (1931 *ed.*), 181; 30 *Corp. Jur.* 1102. The defendant earns $220 a month, and in addition receives lodging and maintenance. The complainant is in a highly nervous state, not at all capable of carrying on the arduous and exacting duties of a nurse, and therefore will be obliged to live on the award received here. I regard the defendant's income as substantial justifying a fair share of this income to be applied to the support and maintenance of the complainant, so that she, too, can live in a fair state of security.

I accordingly find that the defendant pay to the complainant $60 per month, payable $30 on the 1st and $30 on the 16th day of each and every month, and will sign an order in accordance with these determinations.