LESTER P. GERRISH, EXECUTOR

*vs.*

MARION M. CHAMBERS

AND

FIRST NATIONAL BANK OF LEWISTON, TR.

LESTER P. GERRISH, EXECUTOR

*vs.*

MARION M. CHAMBERS AND JAMES E. MONROE.

Androscoggin.          Opinion, January 11, 1937.

*Alice M. Parker,*
*Ralph W. Crockett,* for plaintiff.
*Benjamin L. Berman,*
*David V. Berman,* for defendants.

SITTING: DUNN, C. J., STURGIS, BARNES, THAXTER, HUDSON, MANSER, JJ.

STURGIS, J.    These cases, the one at law and the other in equity, by agreement were heard together by a single Justice sitting in vacation as permitted by the laws of this jurisdiction. The action at law comes forward on exceptions and the equity suit on appeal. Numbers 105 and 106 have been assigned to these cases on the docket of this Court. They will be considered in reverse order.

No. 106 — EQUITY.

### LESTER P. GERRISH, EXECUTOR
#### *vs.*
### MARION M. CHAMBERS AND JAMES E. MONROE.

The complainant, Lester P. Gerrish, in his capacity as executor under the last will and testament of Mary R. Smith, late of Lisbon, Maine, deceased, seeks in this action to impress a trust upon and recover thirty-five hundred dollars or property into which it has

been converted, which it is alleged the defendant, Marion M. Chambers obtained from the testatrix, Mary R. Smith, by fraud and undue influence. The sitting Justice hearing the cause on Bill, Answer and Replication ordered the defendants to forthwith pay the complainant the full amount claimed with interest, otherwise execution to issue.

The printed case shows that on July 2, 1934, Mary R. Smith, a widow, eighty-two years old, suffering from a rectal cancer of long standing and requiring constant nursing and regular medical attendance, through arrangements made by her family physician entered the private hospital maintained and operated at Lisbon Falls, Maine, by the defendant, Marion M. Chambers. It was arranged that the defendant Chambers, who was a trained and registered nurse, should personally care for the testatrix and that the charges for her board and care should be twenty-five dollars a week for the first two weeks and thirty-five dollars a week thereafter. Medical and surgical supplies were to be paid for by the patient. The nurse, Mrs. Chambers, was an entire stranger to the testatrix when she came to the hospital and her care and the charges to be made were arranged on a strictly business basis. Mrs. Smith then had property aggregating more than ten thousand dollars in value, the larger part of which was in the form of deposits in local or near-by banks. Receipted vouchers exhibited at the hearing indicate that she paid all her current bills, including the hospital and nurse's charges, either in advance or as they became due.

After Mrs. Smith was admitted to this hospital, her disease, then in advanced stages, progressed rapidly. The evidence clearly indicates that there was a gradual and progressive weakening of her mental and physical processes. She realized that death was approaching. Within a few weeks after her admission, her condition was such that it was necessary for her to use opiates and tincture of opium was regularly prescribed by her physician in increasing doses and administered by the nurse.

From the time Mrs. Smith entered this hospital, she was entirely dependent upon the defendant, Marion M. Chambers, for care, attention and assistance in the few business matters which she undertook. Her nearest relatives were two granddaughters of whom she

had been very fond and had given substantial presents, who apparently continued in her good graces and were the sole beneficiaries of a substantial part of her property under a will she had previously executed and had never revoked, but they were young girls living in Methuen, Massachusetts, and unable to care for the testatrix or often visit her. She had cousins who called occasionally, but like her friends and neighbors were not regularly available for advice or assistance. The nurse Marion M. Chambers, her sister Gladys Nickerson, also a patient in the hospital, and a cousin James E. Monroe, named defendant in this action, all strangers, were the persons with whom Mrs. Smith was in regular contact and association.

On October 5, 1934, Mary R. Smith signed an order drawn upon her savings deposit in the Manufacturers National Bank of Lewiston, Maine, for the sum of thirty-five hundred ($3500) dollars payable to herself or order. The body of the order was in the handwriting of the defendant Marion M. Chambers. It was signed, however, by Mrs. Smith, who also wrote below her signature, "October 5th, 1934. Lisbon Falls Maine. Please send me a cashiers check." On the same day, Mrs. Chambers presented this order at the bank on which it was drawn, and when asked what Mrs. Smith was going to do with this money by the assistant cashier, as he says, replied, "I don't know, but she is all right." Obtaining the cashier's check, Mrs. Chambers brought it back to the hospital where Mrs. Smith indorsed on it, "Pay only to Marion Chambers." As soon as the check was indorsed, Mrs. Smith gave it to Mrs. Chambers who forthwith returned to Lewiston and deposited it in her own savings account which she carried in the First National Bank of Lewiston. On October 22, 1934, Mrs. Smith died. Eighteen days later, on November 9, 1934, Mrs. Chambers drew thirty-five hundred ($3500) dollars from her savings account, purchased a house in Lisbon Falls, and caused a deed thereof to be given to her cousin, the defendant James E. Monroe, who on the same day executed a will devising the property back to her at his death.

The complainant charges that the money turned over to the defendant Marion M. Chambers by his testatrix was obtained by fraud and undue influence and the transaction was unconscionable. This is the ground upon which the learned Justice sitting

below rendered his decree. His findings of fact are not to be reversed upon appeal unless they are clearly wrong. The burden to show the error is upon the appellant. *Savings Institution v. Johnston and Jose*, 133 Me., 445, 180 A., 322; *Meader* v. *Cummings*, 131 Me., 445, 163 A., 792; *Adams* v. *Ketchum*, 129 Me., 212, 151 A., 146; *Merryman* v. *Jones*, 126 Me., 130, 131, 136 A., 667.

Fraud in equity includes all wilful or intentional acts, omissions or concealments by which an undue or unconscientious advantage is taken over another. Undue influence is a species of constructive fraud. Whenever two persons have come into such a relation that confidence is necessarily reposed by one and the influence which naturally grows out of that confidence is possessed by the other and this confidence is abused or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his or her position will not be permitted to retain the advantage.

The term "Fiduciary or confidential relation" embraces both technical fiduciary relations and those informal relations which exist whenever one person trusts in and relies on another. And the rule is that whenever a fiduciary or confidential relation exists between the parties to a deed, gift, contract or the like, the law implies a condition of superiority held by one of the parties over the other, so that in every transaction between them by which the superior party obtains a possible benefit equity presumes the existtence of undue influence and the invalidity of the transaction, and casts upon that party the burden of proof of showing affirmatively by clear evidence that he or she acted with entire fairness and the other party acted independently, with full knowledge and of his own volition free from undue influence. *Burnham* v. *Heselton*, 82 Me., 495, 500, 20 A., 80; *Eldridge* v. *May*, 129 Me., 112, 116, 150 A., 378; *Mallett* v. *Hall*, 129 Me., 148, 153, 150 A., 531.

The defendants insist that the money which Mrs. Chambers received from Mary R. Smith was a voluntary and unsolicited gift and attempt to sustain the validity of the transaction by the testimony of the following witnesses.

Gladys Nickerson, a sister of the defendant Marion M. Chambers, testifies that she came to her sister's hospital as a patient on Labor Day 1934 and stayed there until October 12th following,

and making the acquaintance of Mrs. Smith who occupied the next room visited her frequently and often sat with her on the piazza. She insists that from the time she arrived until October 7, 1934, Mrs. Smith was at all times mentally alert, interested in current events, and apparently entirely rational in her speech and actions. She claims that Mrs. Smith told her on several occasions that the nurse, Mrs. Chambers, had been very kind and attentive to her and that she was going to make her a good present, the amount not being stated, and on one of these occasions, speaking of her granddaughters, said she had plenty left for them. This witness insists that she was present in the forenoon of Friday, October 5, 1934, when Mrs. Smith dictated the order directing the Manufacturers National Bank to send her a cashier's check for thirty-five hundred ($3500) dollars. She says that Mrs. Chambers wrote out the order in accordance with the dictation and that she saw Mrs. Smith sign the paper and add in her own handwriting the direction to the bank for the transmission of the funds by cashier's check. Her statement is that when Mrs. Chambers brought the check back she gave it to Mrs. Smith who endorsed it making it payable "Only to Marion Chambers" and passed it to Mrs. Chambers with the remark, "Here is a present I am giving you of $3500." Her recital of what then occurred is that Mrs. Chambers thanked Mrs. Smith "and said it pleased her." And finally, she says that when Mrs. Chambers had returned from depositing the endorsed check in her own bank account, Mrs. Smith asked the witness to write a letter for her stating that she had given this money to Mrs. Chambers as a gift and of her own free will. She insists that Mrs. Smith dictated each and every word of the letter and she wrote it down for her and saw her sign it.

An elderly neighbor, Josephine O. Coolidge, who made frequent but brief calls on Mrs. Smith states that, although she found her a very sick woman and very weak, she was, in so far as she observed, up to the last time she saw her, still rational and in possession of her faculties. And another friend, Alice H. Elder, insists that she saw her up to October 15th and goes so far as to say she never saw any breaking down of her mental faculties.

Arrayed against this testimony are the statements of relatives and friends who saw Mrs. Smith before and after this money was

turned over. Druggist's records and medical testimony are in the record. The following summary sets forth some of this rebuttal evidence.

Annie M. Swett, a neighbor who had known Mrs. Smith for more than forty years, frequently visited her before she came to the hospital and after her arrival there called usually once a week. This apparently disinterested witness testifies that she noticed that Mrs. Smith was gradually growing weaker. On at least six occasions, at the request of Mrs. Chambers, she went to the hospital to care for Mrs. Smith. She was there on Labor Day, the first Monday of September, 1934, and stayed there until late in the evening. She reports that Mrs. Smith was confused during her stay. The following Wednesday, Mrs. Swett was again at the hospital during the late afternoon and evening. At that time she had difficulty in keeping her in bed. She was tearing up cotton and, without cause, insisting that she must wipe the floor and wash the walls. She was finally quieted and induced to return to her bed. The inference to be drawn from this testimony is that the testatrix was not rational at that time. On September 30, 1934, Mrs. Swett called at the hospital again and says she was told by the nurse, Mrs. Chambers, that the testatrix "was bad" and "wasn't any better from her trouble than she was the last time I was down there." Mrs. Swett was allowed to go in and see the patient, however, but she was in bed lying face to the wall, appeared very weak and "didn't make any talk."

William C. Robinson, a cousin to Mrs. Smith at whose home she had lived prior to her going to this hospital, called on her in the latter days of September and found her in bed in a drowsy condition, unable or at least unwilling to carry on conversation. He called three times in October but Mrs. Chambers, the nurse, did not allow him to go into the room.

Albert Prosser, at whose home Mrs. Smith had lived some years previously, called on her at the hospital and testifies that she grew continuously worse. He saw her on an average of once a week and says that she failed rapidly. He was there on October 6, 1934, the day after the alleged gift here in controversy was consummated, and states that Mrs. Smith was at that time in bed, her mouth was drawn and she was gasping for breath. She gave no indication that she knew her visitor. Mr. Prosser said to the nurse, Mrs. Chambers,

"I don't think she will live through the night," and received the reply from her, "I don't think she will myself." Mr. Prosser called a week before and Mrs. Smith at that time looked very badly, volunteered no conversation and was in a weak condition. He says that Mrs. Chambers at that time told him that Mrs. Smith was "about the same, only gradually growing weaker."

On October 9, 1934, Marion J. Ricker, an officer of a lodge to which Mrs. Smith belonged, called and found her in a very low condition, apparently in a stupor. Her eyes were closed and her mouth was open. Mrs. Chambers told the visitor that the physician didn't think the patient would live through that night. This witness saw the testatrix again on October 17th and again her condition was worse.

The granddaughters, Annie and Nancy Collinson, visited the testatrix at the Chambers hospital in August before her death and agree that, although during the week they stayed there Mrs. Smith was twice wheeled out on the piazza, at other times she was confined to her bed. They say she was very sick and weak, forgetful but otherwise generally rational. In September, they visited her again for a brief stay and found her much worse, quickly wearied by conversation. On October 12th, when they came in response to a letter written by Mrs. Chambers on October 7th notifying them that their grandmother was in a most serious condition and must be seen soon if at all, they found her in a wasted condition and noticeably weaker. They were then told by Mrs. Chambers, the nurse, that Mrs. Smith was taking heavy and increasing doses of opium.

The records of the druggists who filled the prescriptions show that from and after July 30, 1934, the testatrix was continually using tincture of opium. At that time, the dose was 25 drops a day and was gradually increased until on September 28th her prescription called for 80 drops per day. On and after October 9th, it was increased substantially, and a physician testifies that the continued administration of opium in such quantities after two or three weeks creates a craving for the drug, affects the memory of the patient and impairs the power of initiative and resistance, and the general morale, and this to a more marked degree when the patient is physically weak and aged as was the testatrix in the case at bar.

It has not been deemed necessary to review all of the evidence in this case. It was carefully considered at the hearing below and has been fully examined and weighed here in all its details. The sitting Justice evidently did not give full credence to the testimony of the witnesses for the defense. It is as difficult for this Court, after reading this record, to believe that the testatrix, Mary R. Smith, when the money in controversy was turned over by her to the defendant, Marion M. Chambers, was in full possession and control of her normal mental faculties and, of her own volition, free from undue influence, intentionally diverted practically a third of her entire estate from the natural objects of her bounty and conferred so munificent a reward upon one whom she had known only for a few months, who had rendered no special or unusual care or attention, and whose charges for services had been fully paid. The facts proven and every fair inference to be drawn from them indicate that the testatrix by reason of her age, the toxic effect of her cancer and the continued use of opiates, had been reduced to a weakened mental condition commensurate with the breakdown and wearing away of her physical processes. And this, of necessity, was known and appreciated by Marion M. Chambers. Mrs. Smith was entirely dependent upon her nurse for her every care and comfort, including the administration of the opiate when her cravings for the drug and the sufferings of her body demanded relief. There can be no doubt that a confidential relation existed between Mrs. Smith and her nurse. Indeed, it would be difficult to visualize a more complete condition of dependence and trust between any patient and her caretaker. It is an entirely warranted conclusion that, even permitting Mrs. Smith, without impartial and disinterested advice, to make this transfer of this large sum of money to her, the defendant Marion M. Chambers took an unconscionable and unfair advantage of her patient. The presumption of fraud which the law casts upon transactions of this kind is not overcome by the evidence. It is confirmed. The decree below was in accordance with established equitable principles. It must be affirmed and the appeal dismissed.

*Appeal dismissed.*
*Decree below affirmed.*
*Costs of this appeal to be added*
*to bill of costs below.*

No. 105 — LAW.

### LESTER P. GERRISH, EXECUTOR

*vs.*

### MARION M. CHAMBERS AND TRUSTEE.

In this action, the presiding Justice, jury being waived and the right of exceptions reserved, found that the plaintiff was entitled to recover four hundred and five ($405) dollars and gave judgment accordingly. The exception reserved was to this ruling and is presented in this form:

"The Court in this law action ruled that the plaintiff was entitled to recover from the defendant the sum of Four hundred and five ($405) Dollars, and rendered judgment for said amount. To this ruling, of the Court, the defendant, being aggrieved thereby excepts and prays that exceptions may be allowed."

The entire record of the evidence, including the exhibits and the decision of the trial Judge, are made a part of the bill of exceptions.

The exception is not properly presented. It is not stated whether the error alleged is based upon the erroneous application of established rules of law or upon findings of fact unsupported by evidence or on other exceptionable ground. The exception is directed generally and indiscriminately to the ruling below giving the plaintiff judgment.

When the court is held by one Justice, any party aggrieved by any of his opinions, directions or judgments in any civil or criminal proceeding may present written exceptions in a summary manner, which when duly allowed are transmitted to this Court for decision. R. S., Chap. 91, Sec. 24. This Court has recently pointed out that the purpose of a bill of exceptions is to present in clear and specific phrasing the issues of law to be considered. Each ruling objected to should be clearly and separately set forth. Rulings which are claimed to be erroneous should be "stated separately, pointedly, concisely." *Dodge* v. *Bardsley et al.,* 132 Me., 230, 169 A., 306. The presentation of a mere general exception to a judgment rendered by a Justice at *nisi prius* does not comply with the statute.

*Exception overruled.*