OSCAR A. CADORETTE ET AL., IN EQUITY

*vs.*

MICHEL CADORETTE, INDIVIDUALLY AND AS
EXECUTOR U/W OF DELIMA BERGERON, ET AL.

York.   Opinion, September 13, 1951.

*Franklin R. Chesley* (deceased),
*Lloyd P. LaFountaine,* for plaintiff.

*Joseph E. Harvey,* for defendant.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL,
WILLIAMSON, JJ.

WILLIAMSON, J.   This is an appeal from a final decree
in equity holding a deed and mortgage, "held (in an inter-
locutory decree) to have been illegally and fraudulently ob-
tained, which made them both void, as a matter of law,"
are "an absolute nullity."

The plaintiffs are three sons and the only daughter of
Delima Bergeron, deceased.   The defendants are the eldest

and remaining son and his wife. The son is named both individually and as executor of his mother's will.

The case was heard at length on bill, answer, replication and proof. After the interlocutory decree was entered, an accounting was taken of the net rents and profits for which the defendants were responsible to the plaintiffs. The final decree calls for certain action by the defendants including payment of the rent income to the date of the decree. No objection is raised to the decree in so far as it is designed to make effective the main holding. No separate findings of fact were filed. See *Tebbetts* v. *Tebbetts*, 124 Me. 262.

The principles of law under which an equity appeal is heard are well established. "An equity appeal is heard anew on the record," and "It is also the law that findings of fact by a sitting justice will be conclusive unless clearly wrong and the burden is upon the appellant to prove it." *Tarbell* v. *Cook*, 145 Me. 339, 75 A. (2nd) 800. See *Cassidy et al.* v. *Murray*, 145 Me. 207, 74 A. (2nd) 230, and cases cited. "In an appeal from the decision of a sitting justice, the appellant has the burden of showing the decree to be clearly wrong, especially when the credibility of witnesses is an issue. In this case the credibility of the witnesses was an important issue. The sitting justice had the advantage of observation of the persons testifying, and their testimony weighed by him must have aided in forming his judgment." *Snow* v. *Gould*, 119 Me. 318, at 321. See also *Young* v. *Witham*, 75 Me. 536, and *Fortin et al.* v. *Wilensky*, 142 Me. 372. We examine the record, therefore, to ascertain if there is evidence sufficient to justify the ultimate finding by the sitting justice.

It will be unnecessary to set forth the evidence in detail. There was ample credible evidence to disclose the following situation.

Mrs. Delima Bergeron, mother of the parties (except the defendant son's wife), died on January 18, 1948 at the age of eighty-four years and nine months. She was left a widow on the death of her second husband in January 1942. For several years, and since before 1942, she owned a home and income producing properties in Biddeford which form the subject matter of the controversy. In addition to the real estate, Mrs. Bergeron had substantial deposits in savings accounts. In no way was the mother dependent upon her children for financial aid. The family was united. The children were on friendly terms with each other and with their mother until her death.

In October 1942 Mrs. Bergeron had a shock, and for a year required the services of a nurse. It was necessary that one of the family take charge of the home. At the outset her eldest son and his wife moved to the mother's home. The wife gave up her employment at her husband's store. In February 1943 by arrangement within the family the son and his wife closed their home and thereafter lived with and cared for the mother. Before this, and after her shock, the mother conferred with a lawyer about disposition of her property. No will or deeds, however, were executed by her at this period.

To an increasing degree the eldest son Michel acted as his mother's business agent, collecting the rents and attending to her properties and banking. From 1942 they had a safe deposit box jointly. In 1944 his mother executed a power of attorney running to him, and he then took over the collection of rents from a brother. Michel became the trusted son and his mother relied heavily upon him.

In March 1946 Mrs. Bergeron made her will, leaving her property in so far as the children were concerned as follows: 74 Pike Street to her sons Oscar and Arthur; 80 Pike Street to her son Alfred and her daughter Rose; 109 and

113 Alfred Street to Michel and his wife Florida, together with all furniture and furnishings in the home at 109 Alfred Street and all fixtures in the store at 113 Alfred Street. The residue of the estate was left to Michel who was named executor without bond. The will was not prepared by the lawyer whom she had previously consulted. It does not appear that the will was read by any of the children. It was then—and indeed had been since the mother's illness in 1942 —the general understanding between the mother and the children that the property would be left as set forth in the will, and that each of the children except Michel would receive a $1,000 savings account. The value of the property left to the defendants, Michel and Florida, was much in excess of the value of the interests in the Pike Street houses devised to the other children, plus the savings accounts.

In October 1947 Mrs. Bergeron had a second shock. Within in a few days her condition was such that there was administered the sacrament of extreme unction. For the remainder of her life she was bedridden, was partially paralyzed, and required the care of a practical nurse. She was also under the care of a physician, who did not testify in the case. There is no suggestion in the record that he was not available. The immediate cause of death was a cerebral hemorrhage.

On December 15, 1947 Michel upon an order signed by his mother closed a savings account of $2,210 in the joint names of his mother and his brothers Alfred and Arthur, and opened two joint accounts of $1,000 each, one in the names of his mother and Alfred, and the other in the names of his mother and Arthur. An existing joint account of $1,096 in the names of his mother and Rose was not disturbed. The three savings accounts were later received by the children from Michel as executor.

Rose told of an incident at the home on December 15. Florida in Michel's presence said in substance that her mother had no more money, that it was necessary to sell the Pike Street houses, and that the houses had been valued for them at about $18,000. We quote a portion of the testimony of Rose:

> "Well, she said that they were going to buy the houses for $9,000 and of course I was close to mother and she would give me $5,000 alone and she would give Oscar one, Fred one, and Arthur two, and she says, 'You will have more than the three together.' 'So,' she says, 'we will go in the room and tell mother that you are going to accept at $5,000.' And we all got up and went to my mother's room, and Michel went first, and he began to crank the bed so she could stand up a little, and he said, 'Rose is going to take the $5,000.' She says, 'What did you say?' And we were coming in, and Florida said, 'Well, tell her; tell her you are going to take the $5,000.' And she saw me and she said, 'Rose, they say I don't have any more money; I don't know what they did with my money,' and she started crying, and I did, too. You think I would ask for $5,000? No, siree. So she brought me in the kitchen and she said, 'Don't cry; you didn't think I would give you as much as that.'"

The incident was denied in its entirety by the defendants.

We come now to the transaction found to be fraudulent. On December 22, 1947 a lawyer came to the home at the request of Michel. The lawyer had not seen Mrs. Bergeron since preparing her will in March 1946. He conferred with Mrs. Bergeron, and the next day returned with the deed and mortgage. The attorney stated in substance that the instruments were prepared to carry out Mrs. Bergeron's directions, that his advice was neither sought by nor given to her, and that he did not know of or inquire about the value of the property conveyed.

By the deed dated December 23, 1947 Mrs. Bergeron conveyed to Michel and his wife Florida the properties on Alfred and Pike Streets, that is, her home and all the income producing properties. Michel and Florida on the same day and as part of the same transaction gave a mortgage upon the same properties to Mrs. Bergeron, conditioned upon support and maintenance for life, with nursing and medical care and a suitable burial. The mortgage and deed were recorded on December 26, 1947. Twenty-three days later — twenty-six days from the delivery of the deed and mortgage — the mother died.

The will was presented for probate in February 1948 by the lawyer who drafted both the will, and the deed and mortgage as well. The plaintiffs attended the Probate Court hearing. No mention was made by the attorney that the property devised to them had been conveyed by their mother.

Not a word was said by Michel or Florida to the brothers and sister about the conference with the attorney or about the deed and mortgage. Not until after the allowance of the will did they learn of the conveyance by their mother of all of her real estate. Under the will, if the deed is effective, the plaintiffs receive nothing.

It is plain from the record that there was a relationship of confidence, dependence and trust between mother and son, shared by his wife. It is equally plain that the son and wife gained substantial benefits from the transaction and the mother nothing. The Alfred Street property was worth about $23,000 and the Pike Street houses a like amount. The home and the real property were worth thousands of dollars more than the value of the promises secured by the mortgage.

Or if we consider the transaction in connection with the expected division of the mother's estate, we find the de-

fendants gained the Pike Street houses at no cost to themselves. Their promise under the mortgage did no more than relieve their mother and her estate of like expenses. Whatever the defendants paid out would increase in like amount the residue left to Michel by will, and in fact this was the result. Michel says he expended some $2,400, and his final account as executor shows he received $4,616.64 from the estate. There was no necessity whatsoever for the mother to dispose of any, let alone all, of her real property. The inventory of her estate shows $4,809.68 in bank accounts in her name, apart from accounts available to her totalling over $3,000 jointly with Alfred, Arthur and Rose.

If Michel and Florida were but innocent recipients of a mother's gift — for their promise under the mortgage held no value for the mother, aged and dying — we may ask why did they not fully and freely disclose the entire transaction to the brothers and sister? Why did they not tell the fact, so interesting to the brothers and sister, that the mother no longer lived in her own home, or derived income from her houses, but relied upon the promise of defendants for support and burial?

The governing principle was stated by Justice, later Chief Justice Sturgis, as follows:

> "The term 'Fiduciary or confidential relation' embraces both technical fiduciary relations and those informal relations which exist whenever one person trusts in and relies on another. And the rule is that whenever a fiduciary or confidential relation exists between the parties to a deed, gift, contract or the like, the law implies a condition of superiority held by one of the parties over the other, so that in every transaction between them by which the superior party obtains a possible benefit equity presumes the existence of undue influence and the invalidity of the transaction, and casts upon that party the burden of proof of showing affirmatively by clear evidence that he or she

acted with entire fairness and the other party acted independently, with full knowledge and of his own volition free from undue influence." *Gerrish, Executor* v. *Chambers et al*, 135 Me. 70, at 74.

See also *Eldridge* v. *May*, 129 Me. 112.

"The presumption of fraud which the law casts upon transactions of this kind is not overcome by the evidence." *Gerrish* case, *supra*. The decree below was fully warranted.

By the terms of the final decree the defendants were required to account for the rent income to September 9, 1950. It will be necessary to modify the decree to provide for payment of rent income subsequent thereto.

The entry will be

*Appeal dismissed.*

*Decree below affirmed except for modification thereof with respect to rent income from September 9, 1950.*

*Final decree to be entered by the sitting justice in accordance herewith.*

*Costs of this appeal to be added to bill of costs below.*